Leibensperger, Edward P., J.
The plaintiff A.R.S. Services, Inc. (“ARS”) commenced this action against its former employee Daniel Morse (“Morse”) and his current employer, 24 Restore NE, LLC (“24 Restore”) (together, “Defendants”), alleging harm arising out of Morse’s breach of a noncompetition agreement. The case is before this court on ARS’ motion for a preliminary injunction. ARS seeks an order enjoining Morse from engaging in the field of “disaster restoration” (as referenced in their agreement) within fifty miles of any ARS office, contacting ARS customers, subcontractors, and vendors for the purposes of soliciting business and services in competition with ARS, and otherwise using ARS contacts or confidential information in any manner. ARS also seeks to enjoin 24 Restore from employing Morse in the field of disaster restoration within fifty miles of any location in which ARS has an office. As will be described below, ARS’ motion is ALLOWED in part and DENIED in part.
BACKGROUND
ARS’ verified complaint and the affidavits the parties submitted reveal the following facts.
I. The Business of ARS
ARS provides emergency disaster restoration and reconstruction services for residential and commercial properties, such as cleaning, deodorizing, fire and smoke damage reconstruction, water damage reconstruction, mold remediation, biohazard cleanup, restoration, and renovation. Richard Piltch Affidavit, par. 2. ARS serves all of New England, and currently has offices in Auburn, Newton, South Yarmouth, and Springfield, Massachusetts; Hudson, New Hampshire; Pawtucket, Rhode Island; and North Haven, Connecticut. ARS obtains its business through “referrals from insurance adjusters in those situations where the insured does not have its own resources.” Daniel Morse Affidavit, par. 5. In these instances, “it is the insured that enters into a contract with ARS for services. The adjuster... cannot require that the insured hire ARS. Further, it is industry practice that the adjusters give their insureds at least 3 disaster restoration companies from which to choose.” Id. “Thus, while ARS may have relationships with some insurance adjusters, these adjusters have similar relationships with other disaster restoration companies and in fact recommend several at a time.” Id. According to ARS president Richard Piltch (“Piltch”), insurance adjusters and property managers are ARS’ “customers” because they generate business for ARS by calling ARS “to the sites of disasters . . . whereby ARS initiates its restoration work and they work with ARS throughout the restoration process.” Richard Piltch Affidavit, par. 3.
*229 II. Morse’s Employment at ARS
Morse had not worked in the field of disaster restoration until he started at ARS on November 1, 2004. “ARS put Morse through an extensive training program to prepare him for his role with [ARS].” Richard Piltch Affidavit, par. 5. Thereafter, throughout his time at ARS, and at ARS’ expense, Morse attended professional and industry association seminars and received specialized industry training in various areas. Piltch estimates that ARS “invested in excess of $250,000 in specialized trainings, certifications, dues and other professional development events for Morse.” Richard Piltch Affidavit, par. 9. “Any knowledge or experience Morse has in restoration and disaster recovery, business, sales and marketing these services comes from the specialized training he received from ARS.” Richard Piltch Affidavit, par. 5.
During his employment at ARS, “Morse regularly interacted with insurance adjusters, properly managers and subcontractors[;]” he “was intimately involved with the management of ARS and privy to detailed information concerning management of [ARS;]” and he “was charged with developing and maintaining business contacts.” Richard Piltch Affidavit, pars. 10-12. Specifically with respect to customer relations, “Morse entertained Customers at sporting events, dinners, and seminars!,] . . . [and] conducted seminars ... for [ARS] Customers at which he provided relevant education free of charge, creating an opportunity to develop business relationships on behalf of ARS.” Richard Piltch Affidavit, par. 12.
Morse held three positions over the course of his eight years at ARS. Morse’s first position at ARS was that of branch manager at ARS’ Pawtucket, Rhode Island office, and then, in March 2007, at ARS’ Newton, Massachusetts office.[2] This position required him, inter alia, to create relationships with new contacts and potential clients by, for example, hosting and attending marketing events such as seminars and sporting events; to assist the general manager in writing the budget for that branch, and then to adhere to and monitor that budget; to monitor and be responsible for cash flow and invoicing; and to assist in the hiring of new employees and conducting training for new and current employees. Exhibit A to Richard Piltch Affidavit. Also, he spent 70% of his time working in the capacity of an “Outside Project Manager both in estimating and producing individual jobs.” Id.
In September 2008, ARS promoted Morse to general manager. Morse worked out of ARS’ Newton, Massachusetts office. In this position, Morse planned and managed restoration projects through completion; supervised and directed field crew workers; communicated work assignments to field supervisors and crews; performed field remodeling and restoration activities; communicated with customers regarding project details, expectations, and required paperwork and documentation; and supervised, maintained, and enforced safety procedures, policies, and standards in keeping with the applicable regulations. Exhibit B to Richard Piltch Affidavit.
Effective January 1, 2011, Morse became the director of operations, still working out of ARS’ Newton, Massachusetts office until October 22 through December 31, 2012, when he worked out of ARS’ South Yarmouth, Massachusetts office. ARS’ management team decided to move Morse to this position “because as [ARS] was rapidly growing, [it] needed a more experienced General Manager and [the management team] thought it would be a good fit for Morse to focus more on operations.” Richard Piltch Affidavit, par. 6. Morse views the assignment to director of operations to be a demotion. Daniel Morse Affidavit, par. 16.
This position required Morse to “report directly to the General Manager and... [to] be responsible for overseeing the daily functions and overall competency of Branch Personnel.” Exhibit C to Richard Piltch Affidavit. Morse met regularly with the general manager, the owner, and Piltch to discuss progress, to identify areas and strategies for improvement, and to set monthly goals. Id. He also communicated daily with the general manager “regarding all facets of business including profitability, forecasting, training, evaluations, hiring, and termination of employees.” Id. His other duties included visiting all branches on a weekly basis “to perform various reviews of practices” such as site visits; reviewing budgets with branch managers and outside project managers on a monthly, quarterly, and yearly basis; reviewing all jobs over $25,000; attending seminars; and developing and maintaining relationships in the insurance and property management industry. Id.
Within his affidavit, Piltch provided a chart detailing Morse’s salary for 2008 through 2012. During those five years, “Morse was one of the top five most highly-compensated employees at ARS.” Richard Piltch Affidavit, par. 7:
[[Image here]]
*230 Id. Piltch explains in his affidavit that “[t]he outsized profit bonus in 2010 came about due to an aberration of severe flooding and a net result of 50% more volume in sales than budgeted. Morse’s bonus, based on his contract, was paid over two years, 2010-2011.” Id. Morse’s compensation in 2011, “including his net profit percentage, was adjusted to reflect his change in responsibilities. He again earned a large net profit bonus that year, attributable to 20% more volume in sales than budgeted.” Id. “In 2012, all bonuses, including Morse’s, were reduced, as the company’s sales volume fell 20% below budgeted sales. In 2012, ARS also forgave a loan given to Morse to buy a car.” Id.
III. The Agreement
On May 2, 2007, Morse signed an “Employee Nondisclosure, Noncompetition and Nonsolicitation Agreement” (“Agreement”) pursuant to which he agreed to refrain from certain conduct “(i]n consideration and as a condition of [his] employment with [ARS], . . . and other good and valuable consideration . . .” Agreement, Introductory Paragraph. This compensation included a specific payment in the amount of “$8,750, payable over four consecutive quarters, on May 2, 2008, August 1, 2008, December 31, 2008 and January 30, 2009.” Richard Piltch Affidavit, par. 17. If he had not signed the Agreement, ARS would have terminated him. Daniel Morse Affidavit, par. 9.
The Agreement expressly provided that “[t]he terms and conditions of this Agreement and its enforceability shall continue to apply and be valid notwithstanding any change in [Morse’s] duties, responsibilities, position or title with [ARS] ...” Agreement, par. 9. Morse also agreed that any breach of the Agreement would cause ARS irreparable harm, entitling ARS to equitable relief such as an injunction or specific performance, in addition to any remedies at law. Agreement, par. 5.
The Agreement provides, in pertinent part:
1. Nondisclosure of Confidential Information. I will not at any time, whether during or after the termination of my employment, reveal to any person or entity or use for my benefit or that of any other person any of the trade secrets or confidential information concerning the organization, business or finances of [ARS] or of any third party which [ARS] is under an obligation to keep confidential [ ]including but not limited to . . . methods, business plans, methods of operation, know-how, techniques, [pricing] systems . . . customer lists, client lists, vendor lists, subcontractor lists (or any contact information included on any of the foregoing lists) . . .
During my employment and thereafter I shall not make, use or permit to be used any notes, memo-randa, reports, lists (including without limitation lists of customers, clients, vendors or subcontractors and any contact information included on any such lists), ... or other materials of any nature relating to any matter within the scope of the business of [ARS] or concerning any of its dealings or affairs otherwise than for the benefit of [ARS] ... [A]ll of the foregoing shall be and remain the sole and exclusive property of [ARS] and . . . immediately upon the termination of my employment I shall deliver all of the foregoing, and all copies thereof, to [ARS] at its main office.
3. Noncompetition. During the term of my employment with [ARS] and for one year thereafter, I will not, without [ARS’] prior written consent, directly or indirectly, alone or as a partner, joint venturer, officer, director, employee, consultant, agent, or independent contractor of or investor in any entity or business, engage in the field of disaster restoration, including without limitation emergency cleaning, within fifty (50) miles of any location in which [ARS] has an office at such time. In addition I agree that during my employment and for a period of two years thereafter I will not, directly or indirectly, solicit or provide, alone or with or by or through others, products or services competitive with those provided by [ARS] during the term of my employment to any individual or entity that was a customer of [ARS] during my employment or was a prospective customer of [ARS] during such period, or any affiliate of such individual or entity.
4. NonsoUcitation. During the term of my employment with [ARS] and for two years thereafter, I will not, directly or indirectly, employ or retain, or knowingly . . . (b) cause or solicit any customer or client of [ARS] to end or limit its business relationships with [ARS] or to use any other vendor’s products or services in lieu of those provided by [ARS], or (c) cause or solicit any vendor or subcontractor of [ARS] to end or limit its business relationships with [ARS] or to enter into business relationships with any entity or business which is directly or indirectly engaged in the field of disaster restoration, including without limitation emergency cleaning, in a manner that is in any way harmful or detrimental to [ARS].
9. Separate Covenants. . . . [I]f one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity or subject so as to be unenforceable at law, such provision or provisions shall be construed by the appropriate judicial body by limiting and reducing it or them so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear.
In addition to signing the Agreement himself, Morse traveled to various ARS offices to present the Agreement to ARS employees. Richard Piltch Affidavit, par. 14; Michele Strand Affidavit, par. 4 (ARS’ Worcester office); Stephen Bouzan Affidavit, pars. 3-4 (ARS’ New *231 ton office). According to ARS employees, Morse explained the terms of the Agreement to the employees and informed them that if they chose not to sign the Agreement they could not continue to work at ARS. Michele Strand Affidavit, par. 4; Stephen Bouzan Affidavit, pars. 3-4. Morse told them that they had time to review the Agreement and to consult with an attorney before signing it; he also told them that they had the opportunity to discuss their concerns about the Agreement with management. Id.
At the time Morse signed the Agreement, ARS had offices in Newton and Worcester, Massachusetts, and in Pawtucket, Rhode Island. Daniel Morse Affidavit, par. 9. Since then, ARS has added offices in Auburn, South Yarmouth, and Springfield, Massachusetts; Hudson, New Hampshire; and North Haven, Connecticut. Based on the chart that Defendants submitted with their opposition, the Agreement’s fifty-mile-radius restriction precludes Morse from performing disaster restoration work in Eastern New England, i.e., Massachusetts, New Hampshire, Rhode Island, and Connecticut. Exhibit C to Defendants’ Opposition to ARS’ Motion for a Preliminaiy Injunction.
IV. Morse’s Final Months with ARS
In August 2012, Morse decided to resign from ARS. According to Hitch, Morse first informed Piltch and then the ARS management team that he wanted to leave ARS and the disaster restoration industry. He asked if he could stay with ARS through the end of 2012. It is ARS’ “policy to immediately terminate the employment of an employee if [ARS] discovers] that [the employee] plan[s] to leave to work for a competitor. [Piltch] agreed to keep Morse as an employee for several months based on his assurances that he was not going to work for a competitor in [ARS’] industry.” Richard Piltch Affidavit, par. 21.
According to Morse, he announced his resignation to the management team in a manner that an ARS consultant had “scripted” “in order not to set off panic within [ARS] that a long tenured key employee was leaving . . . [Morse] was the last person anyone thought would leave ARS as [he] had been a constant throughout [ARS’] growth. Mr. Hitch and [the consultant] knew this so [the three of them] agreed to say that [Morse] was leaving because [he] wanted to pursue other passions . . .” Daniel Morse Affidavit, par. 20.[3] As of August 2012, Morse did not know what he wanted to do once he left ARS. Daniel Morse Affidavit, par. 26.
Between September and December 2012, “Morse was intimately involved with the preparation and launch of ARS’s South Yarmouth branch. Morse’s primary responsibility was to develop the skills and abilities of personnel staffing the South Yarmouth branch and ‘assist them with the launch of the branch, recruitment and training of technicians, and establishment of customer, vendor, subcontractor and other relationships necessary to meet the needs of ARS and its customers.’ ” Richard Piltch Affidavit, par. 22, quoting Exhibit C to Richard Piltch Affidavit (September 28, 2012, letter from Piltch to Morse setting out responsibilities for this position); see Peter Barton Affidavit, pars. 2-6 (discussing Morse’s work at South Yarmouth branch). According to the South Yarmouth office’s branch manager, Peter Barton with whom Morse worked closely during those three months, Morse told him that he was speaking with Piltch “about trying to get out of’ the Agreement but was unsuccessful. Peter Barton Affidavit, pars 8-9. Also during this period, “Morse attended several marketing events, trainings, seminars and sporting events on behalf of, and paid for by ARS[,]” Richard Piltch Affidavit, par. 23, including the New England Institute of Restoration and Cleaning conference in Las Vegas, Nevada in September 2012.[4]
Morse and Piltch met on December 6, 2012. In a December 12,2012 email to Hitch, Morse provided his version of what was discussed in that meeting:
I know you understand how much I appreciate having had the opportunity to work for you, and hope that I was a key part in helping ARS become the industry leader it is today. I also wanted to convey my sincere appreciation to you for giving me the opportunity and for how you handled the conversation, how you listened, and your willingness to come up with a “win win” solution that will give me the opportunity to go out on my own and try to grow something on my own. You said yourself that you do not begrudge anyone from making a living and I appreciate your giving me your approval as I embark into a scary situation.
This is an exciting time for me, but also a very unnerving time as well. I am taking a risk here, but I believe in myself and what I have been able to learn under your guidance over the past 8 years. And I hope you can continue to help me along the way, whether it is advice or even throwing me a referral here or there for something that is too small or not a fit for ARS. It is not my desire to compete with ARS, but my desire to find a small niche for myself where I can add some value and grow a business over the next 20 years and beyond. You have always preached there is plenty of business for everyone and I believe that especially as I start out with a truck[,] a ladder and some long/hard days in front of me. I will obviously be starting at the very low end of the food chain and hope that as I build up a reputation and ultimately have the capital to buy some equipment that I may eventually be able to move up to better business opportunities, I know it will take me years to get there, but I think I am up for the challenge. If I can’t be successful then it is on me. As I mentioned last week I genuinely respect your position on “competition” and how you get along with and help many of those companies and *232 work together. Candidly, this is one of the many lessons I have learned by working with you. At the end of the day I am trying to create the same opportunity to build a business and bet on myself as you did 26 years ago.
I can’t say enough how much I appreciate the past 8 years and how you handled our conversation last week. I am looking forward with excitement and a ton of nervous energy for my new business, obviously your continued support means the world to me. To me, this transcends business, and ultimately comes down to 2 friends that care about each others [sic] success. Ultimately, I know this whole change has been difficult on many levels, I have tried my best to do things the right way and I greatly appreciate you doing the same. Please let me know when you will have time again to catch up and figure eveiything out.
Exhibit C to Daniel Morse Affidavit. According to Morse, this email reflects Piltch’s verbal approval of Morse’s “working in the disaster restoration business within the 50-mile limitation set forth in the Agreement, ... [and his agreement to] let [Morse] out of [his] non-compete.” Daniel Morse Affidavit, par. 28; see Lawrence Longo Affidavit, par. 11. The record contains no written response to Morse’s email. Morse concedes that at a subsequent meeting, Piltch “said that he could not give [Morse] written permission to compete with ARS, but then he confirmed that it was acceptable if [Morse] competed with ARS, as long as [Morse] didn’t solicit any of ARS’s customers” by which Morse assumed Piltch “meant property managers.” Daniel Morse Affidavit, par. 29; see Lawrence Longo Affidavit, par. 12.
When he left ARS, Morse “turned in [his] cell phone, iPad, laptop computer, company credit card and company car.” Daniel Morse Affidavit, par. 44. With respect to the cell phone that he returned, Morse had added the contacts obtained over his time with ARS. Daniel Morse Affidavit, par. 45. “The types of contacts that were in the cell phone were insurance adjusters, property managers, vendors, subcontractors, and personal contacts. Other than [his] personal contacts, all of these individuals are well known in the industry, are not secret and can be found on the internet.” Id. Morse retained a thumb drive containing ARS documents he had saved in connection with setting up the South Yarmouth office, but he has “not used any ARS proprietary or confidential information. The thumb drive is in [his] counsel’s possession.” Daniel Morse Affidavit, par. 43.
V. Morse’s Post-Termination Activities
Morse met Lawrence Longo (“Longo”) and Robert Tishman (‘Tishman”) in November 2012. Daniel Morse Affidavit, par. 31. Longo and Tishman formed 24 Restore in December 2012. Its office is located in Easton, Massachusetts, and “the general character of [its] business ... is the restoration and renovation of real property and associated buildings ...” Exhibit H to Richard Piltch Affidavit.
Morse began working for 24 Restore in January 2013. 24 Restore knew when it hired Morse that Morse had signed the Agreement with ARS. Longo and Tish-man hired Morse “[b]ased on [their] understanding that ARS had consented to Mr. Morse working in the disaster restoration business within the 50-mile geographic limitations ...” Lawrence Longo Affidavit, par. 13. As a 24 Restore employee, Morse “began to market [its] services and completed one restoration job . . .” Daniel Morse Affidavit, par. 34. According to Piltch, Morse’s duties at 24 Restore include providing general contracting work, recovery and restoration work from fire and water damage, and biohazard emergency cleanup, Richard Piltch Affidavit, par. 25; Morse disputes that “24 Restore has . . . done any fire restoration work.” Daniel Morse Affidavit, par. 35.
Daniel Bernazzani (“Bemazzani”) managed a disaster restoration company for twenty-five years. For the past thirteen years, he has worked as an industry consultant, providing expert advice to insurance carriers and training to restoration and reconstruction companies. Daniel Bemazzani-Affidavit, par. 3. ARS is one of Bernazzani’s clients. He provides ARS with consulting, training, and yearly “continuing education seminars on behalf of [ARS] for professionals including licensed insurance agents, adjusters and other property management professionals in the areas of mold, fire damage, water damage, and other related topics.” Daniel Bernazzani Affidavit, par. 5. Morse and Bernazzani met through their work for ARS. According to Morse, Bemazzani “did not refer any jobs to ARS as far as [Morse] [is] aware.” Daniel Morse Affidavit, par. 46.
On January 9, 2013, Morse invited Bemazzani to meet him for lunch. “At lunch, [Morse] told [Bernazzani] he was going to work for a company called 24 Restore performing cleaning and reconstruction related to biomediation. This work is in the same insurance field as [ARS’] work and relies on the same contacts for project leads.” Daniel Bemazzani Affidavit, par. 13. Morse acknowledged the Agreement with ARS “and said he realized that by contacting [Bernazzani] he may be in violation of his agreement.” Daniel Bernazzani Affidavit, par 14. He also told Bernazzani that he intended to contact “[ARS] clients to let them know he is now in the business” and he asked Bernazzani “if [he] would refer business to him at 24 Restore.” Daniel Bemazzani Affidavit, par. 15-16.
William Lamb (“Lamb”) oversaw property claims for Arnica Insurance for thirty years. Since he met Piltch about fifteen to twenty years ago, Lamb has “worked continuously with ARS.” William Lamb Affidavit, par. 2. “As [ARS] grew its capabilities and its service area, [Lamb] had more and more contact with the company" and referred cases to ARS through “a third-party *233 administrator for emergency mitigation and restoration services.” William Lamb Affidavit, pars. 2-3. Lamb is currently a property loss manager at The Norfolk & Dedham Group, and he continues to refer work to ARS, also through a third-party administrator. William Lamb Affidavit, par. 3. Lamb met Morse through their work for ARS.
On January 21, 2013, at Morse’s request, Morse met with Lamb at Lamb’s office. Morse told Lamb that he had left ARS and “was going to operate a small business on his own, doing reconstruction and remodeling work.” William Lamb Affidavit, par. 3. Morse acknowledged the Agreement, “but he told [Lamb] that he had a verbal agreement with . . . Piltch that he could do reconstruction and remodeling work as long as he did not engage in emergency mitigation services, which is a big part of [ARS’] business.” William Lamb Affidavit, par. 8. Morse asked Lamb to refer business to him. Lamb’s “only source of referrals ... is people who have filed insurance claims due to some type of property loss. [He] gave no assurances that [he] would be able to refer any work to him.” William Lamb Affidavit, par. 7.
On January 29, 2013, ARS sent a letter to Morse and to 24 Restore, demanding that Morse cease and desist violating the Agreement. Exhibit K to Richard Piltch Affidavit. Morse responded in a letter dated February 5, 2013, in which he rejected ARS’ claim that he had violated the Agreement “because, among other reasons, . . . [Piltch], in recent conversations, expressly gave [Morse] the right to ‘earn a living’ in the field of disaster restoration in the active business areas of ARS, despite the terms of the Agreement.” Exhibit D to Daniel Morse Affidavit. That notwithstanding, Morse agreed to work from a 24 Restore office located outside the Agreement’s fifty-mile radius id., and, “since early February, [Morse] [has] been working only in the State of Maine for 24 Restore.” Daniel Morse Affidavit, par. 39; Lawrence Longo Affidavit, par. 15. 24 Restore responded to ARS’ cease and desist letter with a letter, dated February 6, 2013, similar to Morse’s. Exhibit A to Affidavit of Lawrence Longo.
ARS filed this action against Morse and 24 Restore in March 2013.
DISCUSSION
ARS seeks a preliminary injunction that enforces the terms of the Agreement. “A preliminary injunction ordinarily is issued to preserve the status quo pending the outcome of litigation.” Doe v. Superintendent of Schs. of Weston, 461 Mass. 159, 164 (2011). “The issuance of a preliminary injunction generally rests within the sound discretion of the judge ...” T&D Video, Inc. v. Revere, 423 Mass. 577, 580 (1996), S.C., 450 Mass. 107 (2007) (citation omitted). The court exercises this discretion only after determining that the moving party has met its burden of demonstrating by a preponderance of the evidence “(1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of the plaintiffs likelihood of success on the merits, the risk of irreparable harm to the plaintiff outweighs the potential harm to the defendant in granting the injunction.” Tri-Nel Mgmt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980); Carroll v. Marzüli, 75 Mass.App.Ct. 550, 552 (2009).
I. Likelihood of Success on the Merits
ARS asserts seven claims. The court will focus its analysis on determining the likelihood that ARS will successfully demonstrate that Morse’s conduct violates the terms of the Agreement. See, e.g., A.R.S. Seros., Inc. v. Baker, MICV12-00105, slip op. at 5 n.3 (Middlesex Super.Ct. Feb. 21, 2012) (Murtagh, J.) [29 Mass. L. Rptr. 457] (Exhibit A to Plaintiffs Motion) (“Although ARS has pled other claims against [the defendants], this Court addresses only ARS’ breach of contract claim, i.e., the Agreement, because ARS is only entitled to a preliminary injunction if it establishes a likelihood of success on the merits of this claim”).
A. Enforceability of the Agreement
As an initial matter, Morse challenges the enforceability of the Agreement arguing that material changes in Morse’s employment relationship with ARS after signing the Agreement render the Agreement void. Alternatively, Morse argues that the Agreement’s restrictive covenants are not reasonably limited in scope.
1. Morse’s Employment Relationship
Morse characterizes his change in position from general manager to director of operations in 2011 as a demotion, pointing out that in the latter position he reported to the new general manager and no one reported to him. Morse also points to allegedly decreased salary as further proof of his demotion. He argues that it would be unfair to enforce the Agreement given such a substantial change in circumstances.
The Agreement provides that “[t]he terms and conditions of this Agreement and its enforceability shall continue to apply and be valid notwithstanding any change in [Morse’s] duties, responsibilities, position or title with [ARS] ...” Agreement, par. 9. Thus, the parties understood that the Agreement was intended to be enforceable notwithstanding a potential change in employment responsibilities. The noncompetition agreement was required by ARS from a wide range of employees, including those reporting to a general manager. Morse, himself, explained the Agreement to such other employees. No persuasive reason is advanced by Morse for ignoring the terms of the Agreement.[5]
*234 Moreover, ARS has the better of the argument that Morse’s employment changes were not “material” to render the Agreement void as a matter of equity. According to Piltch, ARS’ rapid growth necessitated a general manager who had more experience than Morse, and ARS’ management team decided Morse was better suited to focus on operations. The job description of each position displays this shift in focus: the general manager position appears to be concerned with managing ARS’ restoration projects at all stages and levels; the director of operations position appears to be concerned more with the management of the branch offices themselves, including budget review and personnel training and evaluations. Despite the variations in each position’s underlying focus, however, both roles required Morse to be involved in ARS’ disaster restoration projects and to promote ARS’ brand by attending industry seminars and maintaining his industry relationships.
Morse’s salary in 2011 and 2012 was about $4,000, or 4%, less than it had been in 2010. The amount of his quarter bonus in 2011 was the same as it had been in 2010, i.e., $50,000; his quarter bonus decreased in 2012, to $10,000, which was consistent with the company-wide bonus reduction that resulted from a 20% decrease in sales volume. Four percent decrease in base salary notwithstanding, Morse still remained one of the five highest-compensated employees at ARS between 2008 and 2012.
Based on these facts, ARS has a substantial likelihood of successfully establishing that the Agreement is enforceable and that Morse’s change in employment status did not act to vitiate the bargained for Agreement.
2. Scope of the Agreement
“A covenant not to compete is enforceable only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest.” Boulanger v. Dunkin’ Donuts, Inc., 442 Mass. 635, 639 (2004); see Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280, 289 (1974) (‘The consequence of every covenant not to compete! ] ... is that the covenantor is deprived of a possible means of earning his living, within a defined area and for a limited time. That fact alone does not make such covenants unenforceable ”). ARS asserts that the Agreement satisfies these criteria, specifying its good will as the “legitimate business interest” it seeks to protect.[6] See Kroeger v. Stop & Shop Cos., Inc., 13 Mass.App.Ct. 310, 316 (1982) (“Those interests of an employer which are entitled to protection are trade secrets, confidential data and good will” (citing New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 674 (1977))).
“Good will has been defined as a company’s positive reputation in the eyes of its customers or potential customers.” North Am. Expositions Co. Ltd. P’ship v. Corcoran, 452 Mass. 852, 869-70 (2009), citing Marine Contrs. Co., 365 Mass, at 287-89; Slate Co. v. Bikash, 343 Mass. 172, 175-76(1961) (“Good will is necessarily attached to a going business and relates to the ‘name, location and reputation, which tends to enable’ the business ‘to retain the patronage.’ ” (Citation omitted).) “Good will is generated by repeat business with existing customers, ... or by referrals to potential customers.” North Am Expositions Co. Ltd. P’ship, 452 Mass, at 870 (internal citation omitted). “Any restraint must be consistent with the protection of the good will of the employer.” All Stainless, Inc. v. Colby, 364 Mass. 773, 779 (1974).
Defendants challenge three provisions of the Agreement as being too broad. First, for one year after his termination, the Agreement restricts Morse from working in the field of disaster restoration within fifty miles of any ARS office. As the map Defendants provided shows, the fifly-mile-radius restriction results in precluding Morse from working in the field of disaster restoration in most of Eastern New England, but not in Maine where he is currently working for 24 Restore. I find that these geographic area and time restrictions are reasonable to protect ARS’ good will. See, e.g., Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 229 (1975) (holding that geographical area of fourteen towns enumerated in restrictive covenant was not too broad where “the covenant closely coincided with the area in which good will had been developed by [former employer] in the careful operation of its business, which it was entitled to protect” and where evidence established that former employee’s “intention was to work the same area for a competitor which he had previously covered as a part of the [former employer’s] operation”); Kroeger, 13 Mass.App.Ct. at 317-18 (holding that “anywhere east of the Mississippi River” was “overbroad” given that defendant “had never operated stores other than in New England, New Jersey and New York” and affirming court’s “cutting back of the area of restraint to the” areas where defendant employer had operated stores).
The Supreme Judicial Court has found larger geographic areas to be reasonable. For example, in Boulanger, the former employee argued that the covenant restricting him from working in any business that competed with Dunkin’ Donuts within five miles of any Dunkin’ Donuts for two years was an “essentially worldwide, geographic limit” given that there were “approximately 1,400 [Dunkin’ Donuts] stores outside the United States and approximately 3,700 stores in the United States, with approximately 704 stores in Massachusetts and 122 in New Hampshire.” 442 Mass, at 643-44. The Supreme Judicial Court held the two-year limit was reasonable, id. at 643, and upheld the geographic restriction noting, in part, that “a number of [the Court’s] cases have held larger geographic areas to be reasonable . . .” Id. at 645. The one-year, fifty-mile restriction in this case is less limiting than the restriction the Court held was reasonable in Boulanger. See, e.g., Marine Contractors Co., *235 Inc. 365 Mass, at 281, 283, 289 (affirming injunction enforcing covenant restricting former employee from working in “business of marine specialist” within 100 miles of Boston for five years).
Second, for two years after his termination, the Agreement prevents Morse from soliciting from or providing to ARS’ customers or prospective customers any products or services that ARS provides. In isolation, this two-year restriction on soliciting ARS customers could be viewed as reasonable. When considered along with the one-year, fifty-mile restriction, however, it appears unreasonable and not related to ARS’ good will. By the Agreement, ARS implicitly acknowledged that its good will could be protected by a one-year noncompetition provision, limited to a fifty-mile radius from its offices. No argument is advanced as to why a two-year provision is needed. Moreover, the two-year provision is overbroad where it prohibits an ex-employee from soliciting “prospective customers.” That vague term could conceivably include every entity that might hire ARS, thus extending the noncompete from one year to two years. Finally, there is no basis to restrict Morse from soliciting ARS’ customers for restoration work outside of the geographic limits where the noncompetition provision included by ARS in the Agreement implicitly concedes a lack of good will; i.e., business interest, in such outlying areas. Accordingly, this provision will not be enforced.
Finally, also for two years after his termination, the Agreement prevents Morse (1) from causing or soliciting any of ARS’ clients or customers to end or limit their business relationships with ARS or to use any other vendor’s products or services instead of ARS’; and (2) from causing or soliciting any of ARS’ vendors or subcontractors to end or limit their business relationships with ARS or to enter into business relationships with any other entity or business engaged in the field of disaster restoration. Again, the two-year time period cannot be justified by ARS’ legitimate business interests given the agreed upon one-year noncompe-tition provision. Likewise, this provision should not be enforceable outside of the defined geographic area. I find that this provision is enforceable only for one year after Morse’s termination, prohibiting solicitation only for work in the restricted geographic area. In addition, I find that the portion of this paragraph that purports to prohibit Morse from soliciting ARS’ vendors or subcontractors to do business with others engaged in the field of disaster relief is overly broad because it is not related to a legitimate interest of ARS that may be protected. Instead, it may adversely affect the legitimate business interests of such vendors and subcontractors. See, A.R.S. Servs., Inc. v. Hunter, MICV2010-01503, slip op. at 7 (Middlesex Super.Ct. May 7, 2010) (Kottmyer, J.) (Exhibit B to Defendants’ Opposition) (“[C]onsideration of the anticompetitive impact and the legitimate business interests of subcontractors and vendors weighs against issuance of an order that would prevent [former employee or his new employer from] soliciting, using or contacting ARS’ vendors and subcontractors with whom [former employee] dealt during his employment with ARS”).
3. Conclusion
ARS has established a likelihood of success with respect to enforcing the Agreement insofar as it restricts Morse from working in the field of disaster restoration within fifty miles of any ARS office. For work within the restricted area, Morse is bound by the Agreement from soliciting from or providing to ARS’ customers any products or services that ARS provides, and from causing or soliciting any of ARS’ clients or customers to end or limit their business relationships with ARS.
B. Violation of the Agreement
ARS contends that it is likely to succeed on the merits of its claims against Defendants, all of which arise out of conduct that the Agreement proscribes.
1. Oral Amendment of the Agreement
The Agreement prevents a former ARS employee from working in the field of disaster restoration for one year after his termination and within fifty miles of any ARS office unless the former employee obtains ARS’ “prior written consent. . .” (Emphasis added.) Defendants argue that Piltch orally amended the Agreement to permit Morse to work within the field of disaster restoration immediately upon his termination without the time and geographical area restrictions. “[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract. ‘Mutual agreement on modification of the requirement of a writing may ... be inferred from the conduct of the parties and from the attendant circumstances of the instant case.’ ” Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 439 (1992) (ellipses in original) (citation and internal quotation omitted). ‘The evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties.” Id. at 439 n. 10.
Here, in addition to Morse’s affidavit, Defendants provide a copy of a December 12, 2012, email from Morse to Piltch in which Morse discusses his view of their December 6th meeting. Morse writes in the email, in pertinent part, that he appreciated Piltctis “willingness to come up with a ‘win win’ solution that will give [Morse] the opportunity to go out on my own and try to grow something on my own[;]” that “[i]t is not [Morse’s] desire to compete with ARS, but [his] desire to find a small niche for [him] self where [he] can add some value and grow a business over the next 20 years and beyond[;]” and that Morse “genuinely respect[s] [Piltctis] position on ‘competition’ and how [Piltch] *236 get[s] along with and help[s] many of those companies and work[s] together.”
These phrases in the context of the entire email suggest that Morse and Piltch discussed Morse’s post-ARS employment, that Morse intended to start his own business, and that Morse did not want to compete with ARS. The email does not set forth terms, even if believed, to permit the inference that Piltch agreed to allow Morse to deviate, without ARS’ written consent, from an express provision of the Agreement by working in the field of disaster restoration immediately upon his termination. This email is therefore not “of sufficient force” to overcome the presumption that modification of the Agreement requires written consent, see CambridgeportSav. Bank, 413 Mass, at 439 n. 10, and Defendants have not sufficiently rebutted the presumption that the parties could only modify the Agreement in writing.
2. Disaster Restoration Work Within a Fifty-Mile Radius
Morse began working for 24 Restore in January 2013. 24 Restore performs work in the field of disaster restoration, and its office is located in Easton, Massachusetts. Easton, Massachusetts, is within fifty miles of ARS’ Pawtucket, Rhode Island office. ARS has therefore demonstrated its likelihood of success on the merits of its claim that Morse violated the Agreement’s restriction that he not perform disaster restoration work within a fifty-mile radius of any ARS office for one year after his termination.
3. Interaction with ARS’ Clients, Customers, or Prospective Customers
ARS has demonstrated that it will likely succeed in proving that Morse met with Daniel Bernazzani and William Lamb in order to solicit referrals from them, and that Morse intended to contact other ARS customers and clients. Defendants argue that the Agreement does not define the term “customer” and that, construing the term in their favor, Bernazzani and Lamb are not ARS’ “customers” such that ARS can show a likelihood of successfully demonstrating that Morse violated the Agreement by contacting them.
The court must “construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished.” Starr v. Fordham, 420 Mass. 178, 190 (1995) (citation omitted). ARS obtains its business through referrals, thus it considers its customers to be those entities from which it receives those referrals, i.e., primarily insurance adjusters and property managers. Lamb is a property loss manager for an insurance company. Bernazzani is a consultant in the disaster restoration field; even if Bernazzani is not an ARS “customer” because he is neither an insurance adjuster nor a property manager, he is an ARS “client,” who refers business to ARS. Thus, ARS has shown a substantial likelihood of succeeding on its claim thatMorseviolatedtheAgreementbycontacting thesecustomers and clients seeking restoration work for 24 Restore within the geographically restricted area.
II. Claim Against 24 Restore
ARS has demonstrated a likelihood of success on the merits of its claim against 24 Restore alleging tortious interference with contractual relations. ‘To prevail on a claim of tortious interference with a contract, a plaintiff must establish that ‘(1) [it] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.’ ” Psy-Ed Corp. v. Klein, 459 Mass. 697, 715-16 (2011) (citation omitted).
24 Restore admits that it was aware of the Agreement between Morse and ARS. Nevertheless, 24 Restore proceeded to hire Morse in January 2013 and to permit and encourage him to work in the field of disaster restoration within the restricted geographic area. 24 Restore was aware that the Agreement required a modification of the noncompetition provision to be in writing but it elected to proceed, for its own pecuniary interest, with engaging Morse to compete with ARS. With these facts, ARS has demonstrated a reasonable likelihood of success on its claim that 24 Restore interfered with the Agreement between Morse and ARS.
III. Balance of Harms
The court must now determine whether ARS will suffer irreparable harm if an injunction is denied and whether that harm outweighs the harm to Defendants if the court grants the injunction. See Tri-Nel Mgmt, Inc., 433 Mass, at 219; Packaging Indus. Group, Inc., 380 Mass, at 617; Carroll, 75 Mass.App.Ct. at 552. “A plaintiff experiences irreparable injury if there is no adequate remedy at final judgment... In determining the harm to the plaintiff, the court need consider only the harm that would not be redressed by final relief.” GTE Prods. Corp. v. Stewart, 414 Mass. 721, 724 (1993) (internal citation omitted); Packaging Indus. Group, Inc., 380 Mass, at 617 n. 11. “Irreparable harm is absent if trial on the merits can be conducted before the injury occurs.” Packaging Indus. Group, Inc., 380 Mass, at 617 n.ll.
ARS asserts that, without the injunction, Defendants will continue to contact its customers and clients for business within the fifty-mile radius of each of its offices and, as a consequence, ARS will suffer the irreparable harm of losing its good will. As noted, a company generates good will “by repeat business with existing customers, . . . [and] by referrals to potential customers.” NorthAm. Expositions Co. Ltd. P’Ship, 452 Mass, at 870. “[D]amage to client relationships and customer goodwill has been held to be ‘irreparable harm’ under Massachusetts law ...” Bear, Stearns & *237 Co., Inc. v. Sharon, 550 F.Sup.2d 174, 178 (D.Mass. 2008), citing All Stainless, Inc., 364 Mass. 773. I find that ARS has established the requisite irreparable harm.[7] See Packaging Indus. Group, Inc., 380 Mass, at 617 n.ll.
Imposing this injunction on Morse will prevent him from working in the field of disaster restoration within fifty miles of each of ARS’ offices, essentially all of Eastern New England. Since receiving ARS’ cease and desist letter, however, Morse has been working in the field of disaster restoration in Maine, a location that is outside the restricted geographic areas. At the hearing, ARS indicated that it would not seek an injunction if Morse’s work were confined to Maine. Defendants, however, refused to agree to that restriction and, instead, wished to challenge the overall enforceability of the Agreement. By the fact that Morse has the ability to work in his desired field in Maine without violating the Agreement, any irreparable harm he may suffer[8] as a result of the injunction is minimal compared to the risk ARS faces without the injunction. Therefore, as “the balance between these risks cuts in favor of the moving party!,]” issuance of the requested injunction is proper.[9] See id. at 617; see, e.g., Baker, MICV12-00105, slip op. at 8-9 (holding that risk of irreparable harm to ARS outweighed that of former employee Baker where he had been employed at ARS’ competitor “for a short period of time, . . . and as a result, [competitor] has not invested a significant amount of time or money training Baker[,]” and where Baker “can be employed within another division of the [competitor]” or, “[i]f Baker is intent on working in the disaster restoration field he may do so outside of the Agreement’s geographic area”).
IV. Security
Rule 65(c) of the Massachusetts Rules of Civil Procedure provides that, “[u]nless the court, for good cause shown, shall otherwise order, no restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.” See Petricca Constr. Co. v. Commonwealth, 37 Mass.App.Ct. 392, 401 (1994) (“[R]ule 65(c) explicitly allows the court discretion as to security”). Defendants request that the court order ARS to post a surety bond of at least $500,000. Defendants premise their request on the assertion that, if the court issues the preliminary injunction, Morse will not be able to earn a living or support his family. Given that Morse is working in Maine in the field of disaster restoration, there is good cause for this court to deny Defendants’ request, without prejudice. See, e.g., Ethicon Endo-Surgery, Inc. v. Pemberton, 2010 WL 5071848, **2, 8 (Mass.Super.Ct. Oct. 27,2010) (Lauriat, J.) [27 Mass. L. Rptr. 541] (entering preliminary injunction to enforce non-compete agreement but refusing to require plaintiff former employer from posting bond because stipulation in agreement required plaintiff to pay defendant former employee “his gross pay for every month, if any, that the noncompetition agreement prevented] him from finding employment” or to “make up the difference between his salary at [plaintiff] and his new salary if he accepted a lower-paying position because of the [agreement”); Veridiem, Inc. v. Phelan, 2003 WL 22481390, ”1, 3 (Mass.Super.Ct. Sept. 26, 2003) (Van Gestel, J.) [17 Mass. L. Rptr. 8] (enjoining defendant former employee from working at competitor in “relatively small industry” of “market resource management” and requiring that plaintiff former employer post security in the amount of $100,000 given plaintiffs “relative youth in the market resource management business”); Boch Enters., Inc. v. Downing, 1996 WL 1250623, *2 (Mass.Super.Ct. March 6, 1996) (Lauriat, J.) [5 Mass. L. Rptr. 438] (allowing preliminary injunction enforcing non-compete agreement and ordering that it “take effect upon the posting of security in the amount of $7,500 with the Civil Clerk of the Suffolk County Superior Court” pursuant to Rule 65(c)).
ORDER
For the foregoing reasons, ARS’ motion for a preliminary injunction is ALLOWED to the extent set forth below, otherwise it is DENIED. The Defendants’ request for securiiy pursuant to Mass.R.Civ.P. 65(c) is DENIED without prejudice.
It is hereby ORDERED that;
(1) From the date of entry of this decision on the docket through December 31, 2013, Daniel Morse, is restrained from directly or indirectly
(A) engaging in the field of disaster restoration within fifty miles of any ARS office;
(B) contacting any ARS customer in order to solicit or provide products or services competitive with those ARS provides within fifty miles of any ARS office; and
(C) contacting any ARS customer or client in order to cause it to end or limit its business relationship with ARS or to cause it to use any other vendor’s products or services in lieu of ARS’ products or services within fifty miles of any ARS office.
(2) From the date of entiy of this decision on the docket through December 31, 2013, 24 Restore is restrained from interfering with ARS’ contractual relationship with Morse by permitting, encouraging or facilitating Morse from directly or indirectly
(A) performing services in the field of disaster restoration within fifty miles of any ARS office;
(B) contacting any ARS customer or prospective customer in order to solicit or provide prod *238 ucts or services competitive with those ARS provides within fifty miles of any ARS office; and
(C) contacting any ARS customer or client in order to cause it to end or limit its business relationship with ARS or to cause it to use any other vendor’s products or services in lieu of ARS’ products or services within fifty miles of any ARS office.

“[W]hile Morse worked in the Rhode Island office, he was paid through an ARS affiliate . . . When Morse went to work at the ARS office in Newton, he was placed on the Massachusetts corporation’s payroll.” Richard Piltch Affidavit, par. 19.

ARS’ human resources director, Susan Murphy states in her affidavit that she reminded Morse that the Agreement restricted him from working in disaster restoration; in all of their communications between August and December 2012, “Morse never varied from his position that he no longer wanted to work in the restoration industry.” Susan Murphy Affidavit, pars. 2, 6. Morse states in his affidavit that he “never had any discussions with [Susan Murphy] about [his] future plans, nor did she ever remind [him] of any obligations [he] may have had to [ARS] under the Agreement or otherwise.” Daniel Morse Affidavit, par. 24.

According to Morse, he and Piltch attended this conference together. During this conference, they learned that “[h]alf of the regional trade associations were breaking off to start another association and the national association was going to be dissolving. With this turmoil [Morse] did not think it was appropriate to announce [hisj resignation . . . [He] shared [his] concerns with Mr. Piltch and he agreed and understood.” Daniel Morse Affidavit, par. 41. According to Piltch, prior to this conference he and Morse “discussed Morse’s resignation from the NEIRC Board. Upon his return from the conference, Morse reported to [Piltch] that he had resigned from the Board” when, in fact, he had not. Richard Piltch Affidavit, pars. 29-30.

defendants rely upon a recent Superior Court decision in which the court (Locke, J.) held that “each time an employee’s employment relationship with his or her employer changes materially such that the parties have entered into a new employment relationship, the parties must execute a new non-solicitation agreement or covenant not to compete.” Aki-bia, Inc. v. Hood, SUCV2012-02974F, slip op. at 13 (Mass.Super.Ct. Oct. 9, 2012) (Locke, J.) (Exhibit A to Defendants’ Opposition). Applying that principle to the facts before it, the court denied the plaintiffs motion for a preliminary injunction, holding that the agreement was void because “there is significant evidence, by way of sworn affidavits from the parties, to suggest that there were material changes in the employment relationships between the defendants and [the employer] over their multi-year course of employment with the company.” Id.
Thereafter, the plaintiff filed a petition with a single justice of the Appeals Court to seek relief from the Superior Court’s denial of its motion for a preliminary injunction. The plaintiff argued that the cases holding that material changes in em- . ployment void non-compete and non-solicitation agreements are distinguishable “because the parties here had agreed to a broad and all-encompassing contract clause which provided that the covenant not to compete would survive myriad changes in the employment relationship, including changes in compensation.” Akibia, Inc. v. Hood, 2012-J-0390, slip op. (App.Ct. Nov. 21,2012) (Sullivan, J., single justice). The single justice held that the judge “did not commit a clear error of law or an abuse of discretion in denying the motion” because “the judge provided reasoned support for his decision” where “[t]he questions presented are complex, and no existing appellate case inMassachusetts squarely addresses the contract language and course ofconduct presented here. ” Id. (emphasis added).

It does not appear at this time that there is any confidential information belonging to ARS that requires protection. Morse returned the cell phone, iPad, and laptop computer to ARS when he left the company. Moreover, ARS has not demonstrated that any information Morse might possibly have obtained is confidential. See Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 169-70 (1991) (listing factors to consider when determining whether information is confidential); see also Jet Spray Cooler, Inc. v. Crompton, 361 Mass. 835, 842 (1972) (“The subject matter of the [confidential data] must be unknown i.e., known only to the owner . . ." (citation omitted)); J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970) (“Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret" (citation omitted)). Moreover, an employee “may carry away and use general skill or knowledge acquired during the course of his employment” upon termination. Eastern Marble Co. v. Roman Marble, Inc., 372 Mass. 835, 842 (1977), quoting New England Overall Co. v. Woltmann, 343 Mass. 69, 75 (1961); Junker v. Plummer, 320 Mass. 76, 79 (1946). ARS cannot demonstrate that the “know-how” Morse obtained constitutes something other than general skill and knowledge.
With respect to the thumb drive that Morse retained upon leaving ARS, there is insufficient information in the record to conclude that the ARS documents relating to the South Yarmouth office contained trade secrets or confidential information. In any event, for now the thumb drive is in the possession of Morse’s counsel and is not being used by Morse or 24 Restore. Upon discovery of what is in the thumb drive, ARS may renew it motion to enjoin the use of, and to return, the thumb drive.

Moreover, in paragraph 5 of the Agreement, Morse agreed that “any breach of this Agreement by [Morse] will cause irreparable damage to [ARS]... [entitling ARS to]... the right to an injunction . . .” See, e.g., Belkin v. Levenson, 2005 WL 2010340, *4 (Mass.Super.Ct. Aug. 9, 2005) (Van Gestel, J.) [19 Mass. L. Rptr. 621] (holding that similar contractual language “not only obviates the need for the ordinary irreparable damage analysis, it adds contractually binding provisions that this Court is not at liberiy to change or ignore . . . [and that t]hose words, in the absence of something illegal or violative of public policy, must be honored by the Court”).

In their opposition to ARS’ motion for a preliminary injunction, the Defendants assert that the irreparable harm that Morse will suffer is unemployment.

To the extent the court must consider the public interest in enforcing the Agreement, precluding Morse from working within a fifty-mile radius of all of ARS’ offices does not constitute “a significant restraint on ordinary competition” especially where 24 Restore may remain operational and Morse is working in the disaster restoration field outside of the restricted area. See Alexander & Alexander, Inc. v. Dan-ahy, 21 Mass.App.Ct. 488, 501 (1986). Compare Siemens Bldg. Techs., Inc. v. Division of Capital AssetMgmt, 439 Mass. 759, 762 (2003) (suggesting that public interest analysis in preliminary injunction context is limited to cases in which “a party seeks to enjoin governmental action”), with WhitinsviUe Plaza, Inc. v. Kotseas, 378 Mass. 85, 102 (1979) (holding that restrictive covenant “restraining competition will be enforced if it is reasonably limited in time and space and consonant with the public interest”).