Cowin, J.
The plaintiff Affinity Partners, Inc. (“the company” or “Affinity”) seeks a preliminary injunction restraining the defendant Stephen D. Drees (“Drees”) from violating the noncompetition and nondisclosure clauses of the Employment Agreement (“the Agreement”) which he executed before he began working for Affinity. Affinity seeks to enjoin Drees from a) interviewing with or working for a competitor and b) directly or indirectly utilizing or disclosing any proprietary or confidential information he obtained while employed at Affinity. This Court (Cowin, J.) entered a temporary restraining order on November 28, 1995. For the following reasons, plaintiffs motion for preliminary injunction is ALLOWED.
BACKGROUND
The parties have filed affidavits and memoranda and a hearing has been held. The following facts are taken from the parties’ submissions.
Affinity finds and develops business relationships to market affinity and cobranded credit cards between nonprofit and corporate sponsors and the First USA Bank, a credit card company. An affinity card is a major credit card, such as MasterCard or Visa, that is sponsored or endorsed by a group such as an alumni association or charitable organization. A cobranded card credit card is sponsored or endorsed by another corporation such as the GM MasterCard, the Shell MasterCard, or the Walden Books VISA. The affinity card and cobranded credit card market are the fastest growing parts of the credit card market.
Affinity has an exclusive arrangement with First USA Bank and its affiliates (“First USA”) to develop and negotiate affinity and cobranded marketing agreements for MasterCard and VISA credit cards issued by First USA. First USA is Affinity’s sole client. The relationship between First USA and Affinity is governed by an agreement (“First USA Agreement”) which requires Affinity to “take whatever action is necessary or appropriate to ensure that its employees ... comply with the provisions of . . . Section 6" of the First USA Agreement. Section 6 provides that:
(a) All customer and prospective customer lists (unless clearly identified by the disclosing party as being nonconfidential), all business plans, all marketing strategies and programs (including advertising), all information relating to an identifiable customer’s credit card account, the terms and conditions of this Agreement, and all information specifically designated as being confidential that is conveyed by either party to the other shall be deemed confidential.
First USA has the second largest market share of affinity and cobranded credit card programs in the country, measured by number of relationships or credit card partnerships. The largest share belongs to MBNA, America, a Delaware corporation.
Affinity has spent substantial resources developing strategies, pricing structures and marketing plans. Affinity requires every sales and management em-ployee[1] to sign an agreement containing noncompetition and nondisclosure clauses prior to becoming an employee.
Drees worked for MasterCard International (“MCI”) for about three years before being hired by Affinity. At MCI Drees developed new approaches to partnership credit card marketing and acquired an international reputation in that area. In 1993 he became MCI’s Vice-President for cobranded Sales and Marketing.
Later in 1993, the principals of Affinity hired Drees as the Senior Vice-President, Cobranding. His salary was set at an annualized draw of $100,000.[2] Before Drees accepted the new position, MCI asked him to reconsider his decision and offered him more money and further opportunities. Drees’ change in position was noted in several trade journals.
On October 19, 1993, Affinity and Drees executed the Agreement containing inter alia the noncompetition and nondisclosure clauses. These clauses provide as follows:
For so long as Employee is employed by the Company and for the period of time (the “Non-competition Period”) as set forth in Schedule C, Employee will not, without the prior express written consent of the Company, directly or indirectly, engage in, participate in, or assist, as owner, part owner, partner, director, officer, trustee, employee, agent, advisor, or consultant, or in any other capacity, any business organization whose activities are directly or indirectly competitive with or whose activities or *164 services are similar to the activities or services of the Company then existing or then under development or proposed, as may reasonably be determined by the Company acting in good faith.
Employee recognizes that by reason of his affiliation and employment with the Company he has had, or will have, contact with and gained knowledge of certain confidential information, including analy-ses of the Company’s prospects and opportunities, customer lists and potential customer lists, the Company’s plans for present and future development and other proprietary information not available to the public which gives the Company special competence in its field of endeavor, all of which have been or will be acquired at considerable expense to the Company (“Proprietary Information”). Employee understands that as part of his/her employment, Employee is expected to make contributions of value to the Company. Employee acknowledges that the terms of this employment and his/her position with the Company create a relationship of confidence and trust between Employee and the Company with respect to the Proprietary Information. For purposes of this Agreement, Proprietary information shall not include information and data which at the time of disclosure to Employee is generally available to the public on an unrestricted basis or subsequently becomes so available by reason other than Employee’s breach of this Agreement.
Employee will not, during any time after the term of his/her employment by the Company, disclose any Proprietary Information, or anything relating to it, to any person, firm, corporation, association, partnership or other entity or individuals for any reason or purpose whatsoever.
The minimum noncompetition period agreed to by Drees and Affinity, pursuant to the Agreement, is 24 months following termination.
The Agreement provided that Drees could be terminated without cause. In such event, he could continue his then current cash draw for six months, plus family health benefits.
On May 19, 1995, Affinity terminated Drees for failure to generate business. Drees has received $50,000.00 since his termination date. The noncom-petition period began on May 19, 1995 and ends May 18, 1997.
During his employment, Drees learned the strategies that the company and First USA use to find customers; the contract terms between the company’s customers and First USA; First USA’s minimum pricing requirements and the identity of Affinity partners and customers. Affinity claims that this information is highly confidential. Before leaving Affinity, Drees voluntarily had all Affinity information copied from his laptop computer onto a disk and deleted it from his hard drive. The disk was turned over to Affinity.
In an affidavit filed with the Court, Drees states that he has never disclosed any of Affinity’s confidential or proprietary information and that he “has no intention” of disclosing any information about the contracts or deals with which he was involved while at Affinity or about potential licensors “engaged in serious discussion or negotiations with Affinity.”
Drees interviewed at MBNA shortly before he was terminated by Affinity. Before the meeting was held he revealed the terms of the Agreement to MBNA. MBNA is in direct competition with Affinity, but is larger than and engages in many more activities than Affinity.
Plaintiff now seeks to enforce the nondisclosure and noncompetition clauses, claiming it will be irreparably harmed should Drees disclose information regarding Affinity partners and customers and/or the terms of First USA’s contract with Affinity and First USA’s pricing and marketing structure.
DISCUSSION
In order to obtain preliminary injunctive relief, plaintiff must demonstrate:
1) a likelihood of success on the merits; 2) irreparable injury to the plaintiff if the injunction is not granted; 3) that the injury to the plaintiff outweighs any harm which granting injunctive relief would inflict on the defendant; and 4) that the public interest will not be adversely affected by the granting of the injunction. Noncompetition agreements are enforceable to the extent that they are reasonable and necessary to protect the employers’ legitimate interest. Packaging Industries Group v. Cheney, 380 Mass. 609 (1980).
Both the circumstances under which the agreement was made and the circumstances of the termination of the employment relationship are relevant to the determination of reasonableness. Equitable considerations, such as unequal bargaining power, may weigh against enforcement of agreements such as the one in issue because they are often the product of unequal bargaining power. See, for example, Sentry Ins. v. Firstein, 14 Mass.App.Ct. 706, 707 (1982).
In the instant case, however, Drees apparently was recruited by Affinity. It would appear that Drees was in a position to bargain for, and obtain, favorable terms in the Agreement. By his own admission, he could have remained with MCI in a beneficial position. He chose instead to work for Affinity and to accept the terms of employment that it imposed. He was not hired as a low-salaried clerk.
The circumstances of the termination also favor enforcement of the covenants. Affinity claims that Drees was terminated for failure to generate business. Drees claims he was terminated because of personality conflicts among Affinity’s principals. It is impossible, at this point in the proceedings, to determine exactly how helpful Drees was to the company. There is clearly room for dispute on the issue. Whatever the reason for his termination, Drees’ right to a continuing *165 draw (here amounting to $50,000), and health premiums for six months helps to render the circumstances of the termination reasonable.
In regard to the proprietary information clause, an employer may legitimately seek to protect the following by means of an employment agreement: (1) trade secrets; (2) confidential information; and (3) goodwill. New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977) and cases cited. There is no meaningful distinction between “trade secrets” and “confidential information.” Chomerics, Inc. v. Ehrreich, 12 Mass.App.Ct. 1, 10 n.17 (1981); Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 165 (1979). A trade secret may consist of:
any formula, pattern, device or compilation of information which is used in one’s business, and which gives him [sic] an opportunity to obtain an advantage over competitors who do not know or use it. It may be ... a list of customers . . . RESTATE-' MENT OF TORTS, Section 757, comment b (1939).
However, to warrant protection, information must indeed be confidential. The following 6-step analysis is applied to determine whether information is in fact confidential:
(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Jd.[3]
Having considered the above definition and applying the analysis to the facts of this case, Affiniiy has shown that it has a reasonable likelihood of establishing that the information concerning Affinity partners and customers and the terms of the Affinity-First USA contract and First USA’s pricing and marketing structure are confidential information. The information gives Affinity an advantage over competitors and Affinity made efforts to keep the information confidential. Indeed, Affinity was required to do so under its agreement with First USA. Affinity took reasonable measures to keep its information confidential. Affinity is likely to establish that the nondisclosure clause of the agreement is reasonable.
Concerning the noncompetition clause, a covenant restricting competition is not invalid and may be enforced if it is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with the public interest. Whether such a covenant is reasonable in time and space depends upon the facts of each case. Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 716 (1961). Here, Affiniiy seeks to enforce its noncompetition covenant for a period of two years.
In determining whether a restriction is reasonable, a court is to consider the nature of the plaintiffs business and the character of the employment, the situation of the parties, the necessity of the restriction for the employer’s protection and the employee’s right to work and earn a living. Richmond Brothers, Inc. v. Westinghouse Broadcasting Co.. Inc., 357 Mass. 106, 110 (1970).
When any covenant not to compete is enforced, the covenantor is deprived of a possible means of earning a living. That fact alone, however, does not render such covenants unenforceable. Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280 (1974). Affinity has a reasonable likelihood of establishing that the two-year covenant is reasonable. This is particularly true in view of the generous benefits Drees received during the first six months of that period.
Although the covenant is labeled a noncompetition one, it restricts Drees not only from working for any competitors of Affiniiy, but also from working for any company whose activities or services are similar to those of Affinity. This provision appears to be unreasonable. It does not seem that Affinity would be likely to succeed in establishing that such an extensive noncompetition restriction is reasonable. There is nothing in the present record that would render this agreement unreasonable (other than the part above stated), absent a decision that such covenants are per se void as against public policy. This is not the current state of the law.
It is noted that Drees stated in his affidavit that he has never disclosed any confidential or proprietary information of Affinity and has no intention of doing so. In this Court’s opinion, however, an injunction enforcing solely the nondisclosure covenant is of little value to the plaintiff. It would seem to be impossible for plaintiff to ascertain if there is ever a violation. If material is disclosed to a competitor for whom Drees may work, Affinity would have no means of ascertaining (or proving) that fact. Affinity could lose business to a competitor as a result and be unable to determine that it was due to the disclosure of its protected information.
For purposes of a preliminary injunction plaintiff has convinced this court that it has a reasonable likelihood of prevailing. Plaintiff has shown that it will be harmed if the injunction is not granted. The defendant undoubtedly will be harmed by the allowance of this injunction. However, he knowingly accepted the terms of this agreement and he has accepted the benefits of the six-month severance package. The injunction will issue.[4]
PRELIMINARY INJUNCTION
In accordance with the above, it is hereby ORDERED that defendant, Stephen D. Drees, be and he *166 hereby is, enjoined from directly or indirectly engaging in, participating in, or assisting as owner, partner, director, officer, trustee, employee, agent, advisor, or consultant or in any other capacity, any business organization whose activities are directly or indirectly competitive with the Affinity Partners, Inc., and it is FURTHER ORDERED that defendant, Stephen D. Drees, be and he hereby is enjoined from directly or indirectly disclosing any proprietary information of Affinity Partners, Inc., or anything relating to it, to any person, firm, corporation, association, partnership or other entity or individuals for any reason or purpose whatsoever.

Fifteen of Affinity’s twenty-seven employees are in sales and management.

The papers do not explain what an “annualized draw” is.

The growth of the legal fields of Unfair Competition and Trade Regulation has rendered the liability principles relating to unfair trade practices, covered by §757, decreasingly dependent upon the tort law in which they were rooted. Consequently, Section 757 of the Restatement of Torts was omitted from the Second Restatement.

At the preliminary injunction hearing, the Court offered a speedy trial (i.e. in February) to the parties. The company indicated it could be ready by then; defendant wished time for discovery and to prepare counterclaims and could not be ready for trial for about six months. Accordingly, the Court ordered trial rescheduled for June 1996.