Billings, Thomas P., J.
The plaintiff (“Anaqua”) has sued its former employee (“Bullard”) and his new employer (“Lecorpio”) to enforce a letter agreement of employment (“Letter Agreement”) and a “Proprietary Information, Non-Competition and Inventions Agreement” (“Inventions Agreement”) into which Anaqua and Bullard entered on February 1, 2008. The Complaint is in three counts: Count 1 (“Breach of Contract Against Mr. Bullard (Competition)”); Count 2 (“Breach of Contract Against Mr. Bullard (Trade Secrets)”); and Count 3 (“Tortious Interference With Contractual Relations Against Lecorpio”).
Before me are cross motions, of a sort: the plaintiffs request for preliminary injunction (Prayers A and B of the Complaint), and the defendants’ Motion to Dismiss (Paper #20). Anaqua’s entitlement to injunctive relief being largely dependent on the merits of its claims, I have considered these in reverse order.
For the reasons that follow, the Motion to Dismiss is ALLOWED as to Lecorpio but DENIED as to Bullard, and the Motion for Preliminary Injunction is ALLOWED as to Bullard.
MOTION TO DISMISS A. Allegations of the Complaint
The Complaint alleges the following facts, among others, which are hereby taken as true for present purposes. I have additionally taken note of the terms of the Letter Agreement and the Inventions Agreement, which are referenced and quoted in substantial part in the Complaint.[1] Bullard signed the Letter Agreement and the Inventions Agreement on or about February 1, 2008, and began work as Anaqua’s Business Development Director. The Inventions Agreement included the following terms:
Bullard agreed to hold in confidence, and not to use except in his work for Anaqua, the company’s proprietary information, and agreed that documents belonging to the company would be returned to it upon request. (¶¶1, 2, 3.)
There were provisions for inventions not at issue here. (¶¶4, 5, 6, 7, 8.)
There was a non-competition and non-solicitation clause with a duration of twelve months after Bullard left Anaqua’s employ, by which Bullard agreed not to participate, as employee, contractor, officer, director, or equityholder, in “any business which is competitive, directly or indirectly, with the business of the Company anywhere in the world,” and not to solicit its employees (etc.) or its actual or prospective clients or customers. (819.)
There was the standard acknowledgment of enforceability through injunctive relief, and the employer’s right to attorneys fees if it came to that. (¶10.)
Bullard acknowledged:
that my responsibilities, duties, positions, compensation, title and/or other terms and conditions of employment may change from time to time or I may have a break in service or employment with the Company and, notwithstanding any change in any terms and conditions of employment or a break in service or employment, this Agreement shall remain in full force and effect. (¶12 fill).)
And finally:
The provisions of this Agreement are sever-able. If any term or provision hereof (or the application thereof) is held invalid or unenforceable for any reason, the remaining provisions *108 shall not be affected but rather shall remain in full force and effect and shall be enforced to the fullest extent permitted by law. The laws of the Commonwealth of Massachusetts shall govern the interpretation, validity and effect of this Agreement without regard to the place of performance thereof or principles of choice of law. I hereby agree that any and all suits regarding this agreement shall be brought in [sic] solely and exclusively in the Commonwealth of Massachusetts and I hereby consent to the jurisdiction of the state or federal courts of the Commonwealth of Massachusetts. (¶14.)
While employed by Anaqua, Bullard came into possession of its proprietary and confidential information and trade secrets, including “client lists, prospective client lists, knowledge of Anaqua’s pricing methods, Anaqua’s pricing to current customers, knowledge of Anaqua’s negotiations with and offers to prospective clients, product development roadmaps, and corporate strategy plans.”
Bullard left Anaqua on September 20, 2013, telling Anaqua “that he intended to write books.”[2] On April 28, 2014, however, Anaqua learned through a Linked-In posting that he had accepted employment at Lecorpio. Anaqua sent Bullard a cease-and-desist letter the next day, but two days after that, Lecorpio issued a press release announcing that
Mark Bullard has also joined Lecorpio’s team as vice president of product management. In this role Mark will help drive Lecorpio’s customer driven product strategy. Prior to joining Lecorpio, Mark was vice president of sales for Lecorpio competitor Anaqua.
Anaqua alleges that in Bullard’s work for Lecorpio, he will inevitably disclose and use Anaqua’s confidential information. It adds, on information and belief, that Lecorpio knew of Bullard’s post-employment restrictions and induced him to breach them.
In its Motion to Dismiss, Lecorpio has grouped its arguments under four headings: Personal Jurisdiction, Forum Non Conveniens, Choice of Law, and Failure to State a Claim, and they are here discussed in that order. Both sides, in connection with their arguments as to personal jurisdiction and forum non conveniens, have come forward with additional facts, which are summarized as necessary below.
B. Personal Jurisdiction
On a motion to dismiss for lack of personal jurisdiction pursuant to rule 12(b)(2), “the plaintiff] ] bear[s] the burden of establishing sufficient facts on which to predicate jurisdiction over the defendant.” For purposes of reviewing the ruling on the motion to dismiss, (the Court is to] accept as true assertions in the plaintiffs affidavit[s], including any which controvert assertions in the defendant’s affidavits].
Diamond Group, Inc. v. Selective Distribution Intern., Inc., 84 Mass.App.Ct. 545, 548 (2013) (citations omitted).
The defendants’ affidavits aver the following. While he worked for Anaqua, Bullard was a resident of the state of Washington. Anaqua hired him as Business Development Director, in which position he sold An-aqua products and services to customers in the western United States. He had no management responsibilities and received commissions only on sales that he made. In 2011, Bullard was promoted to Vice President of Sales. Now, he was in charge of a five-member sales team that sold Anaqua products across North America, and was a member of the company’s Executive Team, which addressed company-wide issues. He was compensated based partly on his team’s sales performance and in part based on the performance of the company as a whole. He did not, at the time of the promotion, renew the terms of the Inventions Agreement or execute any other agreement relating to post-employment restraints.
Bullard left Anaqua on September 20, 2013. He began work with Lecorpio in late April 2014, working out of its headquarters in Fremont, California.
Lecorpio has no offices or employees in Massachusetts. It conducts on-line advertising directed nationally and participates in national trade shows that attract attendees from all over the company. It has only one customer in Massachusetts.
Anaqua’s materials do not controvert the above, but add evidence that while he was an Anaqua employee, Bullard traveled to Massachusetts at least four times a year on Anaqua business—two sales kick-off meetings, an annual executive meeting, and an annual review meeting. There were weekly executive team meetings in Boston, which Bullard attended by teleconference. He communicated with Anaqua personnel multiple times daily via email, Slype, and telephone. He was paid out of Boston and reported to Anaqua’s CEO, who was based in Boston.
Since starting as a Lecorpio employee, Bullard has rented an apartment and obtained a driver’s license in California. He has not registered to vote there, and his wife and children still live in Washington and intend to remain there.
Lecorpio’s sole Massachusetts client pays it subscription fees in the “five figures,” accounting for 3.47% of its revenues in 2012, 2.99% in 2013, and 2.02% for YTD 2014. Lecorpio markets and licenses its products throughout the United States and globally, and since January 1,2012 has exchanged at least 106 communications (emails, snail-mail, and phone calls) with seven corporate entities located in Massachusetts for the purposes of potential sales, research, or product development. It has met face-to-face in Massachusetts with one potential client, has held four web sales meetings with Massachusetts companies, has met with foreign subsidiaries of Massachusetts *109 companies, and sent two representatives (its COO and another) to the IP Business Congress in Massachusetts for three days in 2013.
While they were still in discussions, Bullard sent Lecorpio a copy of the Inventions Agreement so that its legal counsel could look into it, advise on whether California (as Bullard had heard) would refuse to enforce a noncompetition agreement, and advise on whether or not this depended on Bullard’s becoming a California resident. Later, Lecorpio agreed in writing to indemnify Bullard against any claim by Lecorpio arising out of his commencement of employment with Lecorpio.
The personal jurisdiction issue must be examined separately as to Bullard, who signed a contract with Anaqua that included a forum selection clause, and Lecorpio, which did not.
1. Bullard
A forum selection clause will be enforced “if it is fair and reasonable to do so.” Jacobson v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572, 575 (1995). “A party resisting the enforcement of a forum selection clause must establish that ‘trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court’ ’’; Boland at 825, quoting The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 18 (1972); accord, Cambridge Biotech Corp. v. Pasteur Sanoji Diagnostics, 433 Mass. 122, 130 (2000); Baby Furniture Warehouse Store, Inc. v. Muebles D&F Ltée., 75 Mass.App.Ct. 27, 32 (2009); or that the contractual choice of forum was procured by “fraud, duress, the abuse of economic power, or any other unconscionable means.” Melia v. Zenhire, Inc., 462 Mass. 164, 169 (2012) (employment agreement). Additional factors to be considered are whether the statutes of limitation in the alternative forum would result in an action filed here in timely fashion being time-barred there, or whether the alternative forum “will not entertain [the] action! ]” for other reasons contrary to Massachusetts law. Jacobson at 579-80; see Ajemian v. Yahoo!, Inc., 83 Mass.App.Ct. 565, 579 (2013).[3]
It is fair and reasonable to enforce the forum selection clause in this case. Anaqua is a Massachusetts resident. Bullard, its employee, lived elsewhere but worked for a Massachusetts employer, reported to a Massachusetts boss, traveled here regularly on company business, and communicated with headquarters daily. From 2011 on, he supervised a sales force that sold Anaqua products and services across the continent. Neither he nor Anaqua was a resident of California—now, his preferred forum—when the contract was signed, or at any time during its term. They agreed that their relationship would be governed by Massachusetts law, which will enforce reasonable post-employment restrictions including a noncompetition agreement; California generally will not (see below).
Bullard protests, however, that because his title, job description, and mode of compensation changed in 2011 without the parties signing a new Inventions Agreement or formally renewing the old one, it should be deemed “abandoned and rescinded by mutual consent.” If so, then the original contract “was inoperative when the defendant terminated his employment with the plaintiff.” F.A. Bartlett Tree Expert Co. v. Barrington, 353 Mass. 585, 587-88 (1968).
The difficulty with this argument is that Bartlett did not, as some trial court opinions have since suggested, hold that “(e]ach time an employee’s employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed.” Iron Mountain Information Mgmt., Inc. v. Taddeo, 455 F.Sup.2d 124, 132-33 (E.D.N.Y. 2005). Bartlett held only that on the facts of that case, “(t]he conduct of the parties from 1960 to the date the defendant terminated his employment relationship with the plaintiff [was] inconsistent with an intention that the 1948 contract be continued in effect.” 353 Mass. at 588.
Here, by contrast, the parties’ intentions were crystal clear and in writing: Bullard
acknowledge^] and agreefd]. . . that my responsibilities, duties, positions, compensation, title and/or other terms and conditions of employment may change from time to time or I may have a break in service or employment with the Company and, notwithstanding any change in any terms and conditions of employment or a break in service or employment, this Agreement shall remain in full force and effect. (Inventions Agreement 112(111).)
Where, as here, the parties’ clearly expressed intent is that the agreement for post-employment restraints is to survive a change in the terms of employment, that intent is to receive the same respect that Bartlett accorded the parties’ apparent intent to the contrary.[4]
Finally, Bullard argues that the Inventions Agreement—forum selection clause and all—is invalid because the noncompetition clause is unlimited in its geographic scope. In the era of global commerce, a worldwide restriction is not necessarily unreasonable per se. See, e.g., Genzyme Corp. v. Laidlaw, 84 Mass.App.Ct 1134, 2014 WL 470409 (2014) (Rule 1:28 decision); A.R.S. Services, Inc. v. Morse, 2013 WL 2152181 (Mass.Super. 2013; Leibensperger, J.); EMC Corp. v. Allen, 1997 WL 1366836 (Mass.Super. 1997; Kottmyer, J.) [8 Mass. L. Rptr. 21]. Anaqua has offices in the United States, Europe and India, clients there and in China and Japan, and (more importantly) major competitors in the United States, Europe and Japan. In any event, the Inventions Agreement has an express “blue pencil”/severability clause (see Edgecomb v. Edmonston, 257 Mass. 12, 20 (1926)) that obviates any suggestion that an overreaching noncompete should void the contract in its entirety.
*110 The forum selection clause therefore survives and applies, and Bullard is properly before the Court.
2. Lecorpio
For a Massachusetts court to exercise jurisdiction over Lecorpio—a nonresident and a non-party to the Inventions Agreement and its forum selection clause— "there must be a statute authorizing jurisdiction and the exercise of jurisdiction must be ‘consistent with basic due process requirements mandated by the United States Constitution.’ “ Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 457 Mass. 210, 215 (2010). The statutory and constitutional issues are to be analyzed separately. Id. Once jurisdiction is challenged, the plaintiff has the burden of production as to the requisite jurisdictional facts. Id. at 219; Cepeda v. Kass, 62 Mass.App.Ct. 732, 737-38 (2004).
Anaqua has carried its burden on the purely statutory requirement. G.L.c. 223A, the Massachusetts longarm statute, provides in section 3:
A [Massachusetts] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person’s (a) transacting any business in this commonwealth; (b) contracting to supply services or things in this commonwealth; (c) causing tortious injury by an act or omission in this commonwealth; [and] (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth.
G.L.c. 223A, §3. The term ‘person’ is defined in G.L.c. 223A, §1, to include a corporation. See Intech, 444 Mass, at 125.
None of the first three sub parts of c. 223A, §3 apply here: although Lecorpio did some business in the Commonwealth, there are no claims “arising from” that business, or from its contracting to supply services or things here, or from a tortiously injurious act or omission committed here.
There is, however, jurisdiction under the literal terms of subpart (d)—"causing tortious injury in this commonwealth by an act or omission outside this commonwealth if [the defendant] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." Lecorpio has one significant Massachusetts client and has solicited seven more in the past two and one-half years. It has communicated electronically with these Massachusetts prospects at least 106 times in the same period; has sent a representative to visit with one of them; and three of its top managers have attended a trade show here. The one Massachusetts client pays Lecorpio somewhere between$10,000 and $99,999.99 annually,..which accounted for 3.47% of its revenues in 2012, 2.99% in 2013, and 2.02% forYTD 2014 (the percentage decline being, hopefully, a sign of overall growth).
“It is well settled under Massachusetts law that ’’substantial revenue" is not an absolute amount nor an absolute percentage of total sale. All that is required is literal satisfaction of the statutory requirement." Keds Corp. v. Renee Intern. Corp., 888 F.2d 215 (1989) (holding that “[t]he sale of 6000 pairs of shoes for $15,000 easily meets this requirement”), citing Heins v. Wilhelm Loh Wetzlar Optical Machinery GmbH, 26 Mass.App.Ct. 14, 21 n.5 (1988) (noting that “[c]ourts construing similar provisions in other State statutes have recognized the susceptibility of the test to both qualitative (ratio of local revenue to total revenue) and quantitative (absolute) approaches”), and Mark v. Obear & Sons Co., 313 F.Sup. 373, 375-76 (D.Mass.1970) (holding $5,000 in sales sufficient); see Darcy v. Hankie, 54 Mass.App.Ct. 846 (2002) (sales to Massachusetts customers of $14,152.62 in ten months). The literal requirements of subsection 3(d) of the longarm statute, therefore, are satisfied as to Lecorpio.
It is under the constitutional test that the jurisdictional argument hits a snag. “ The constitutional touchstone’ of the determination whether an exercise of personal jurisdiction comports with due process ‘remains whether the defendant established ’’minimum contacts" in the forum state,’ “ Bulldog, 457 Mass, at 217 (citations omitted), but there is more to it than this.
The doctrine of in personam jurisdiction is divided into general and personal jurisdiction. Lecorpio’s contacts with Massachusetts, although satisfying section 3(d) of the longarm statute, are not so pervasive as to subject it to general jurisdiction.[5] Where the issue is one of specific jurisdiction,
[t]he due process analysis entails three requirements. First, minimum contacts must arise from some act by which the defendant “purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.” Second, the claim must arise out of or relate to the defendant’s contacts with the forum. Third, “the assertion of jurisdiction over the defendant must not offend ‘traditional notions of fair play and substantial justice.’ ”
Bulldog, 457 Mass, at 217 (citations omitted).
The requirement that the claim “arise out of or relate to the defendant’s contacts with the forum” is central to the exercise of specific jurisdiction, as the U.S. Supreme Court has emphasized in two decisions earlier this year. In Daimler AG v. Bauman, 134 S.Ct. 746 (2014), the court held that a federal court in California, where the defendant did business, lacked jurisdiction over claims by Argentine residents that defendant’s subsidiary had collaborated with state *111 security forces during Argentina’s 1976-1983 “Dirty War” to kidnap, detain, torture, and kill plaintiffs or their relatives. The court explained:
International Shoe's[6] conception of “fair play and substantial justice” presaged the development of two categories of personal jurisdiction. The first category is represented by International Shoe itself, a case in which the instate activities of the corporate defendant “ha[d] not only been continuous and systematic, but also g[a]ve rise to the liabilities sued on.” International Shoe recognized, as well, that “the commission of some single or occasional acts of the corporate agent in a state” may sometimes be enough to subject the corporation to jurisdiction in that State’s tribunals with respect to suits relating to that in-state activity. Adjudicatory authority of this order, in which the suit “aris[es] out of or relatéis] to the defendant’s contacts with the forum," is today called “specific jurisdiction."
Id. at 754 (2014) (citations omitted: emphasis supplied).
Here, unlike in Daimler, the plaintiff is a resident of the forum, seemingly a point in favor of specific jurisdiction. Six weeks after its Daimler decision, however, the court decided Walden v. Fiore, 134 S.Ct. 1115 (2014). The plaintiffs were Nevada residents who alleged that the petitioner (the defendant below), a Georgia policeman deputized as a DEA agent, had intercepted them at Atlanta’s Hartsfield-Jackson airport and unlawfully confiscated $97,000 in cash for forfeiture as drug proceeds. The cash was later returned, but the petitioners lost the use of it in the meantime. The plaintiffs brought suit in Nevada federal court.
In a unanimous opinion, the court held that the plaintiffs could not pursue their claim in Nevada, notwithstanding their assertions that the defendant knew they lived there and that his actions had “caused them ‘foreseeable harm’ in Nevada.” Id, at 1121. The reason was that the defendant’s tortious acts—whatever their consequences in Nevada—took place exclusively in Georgia.
“Specific” or “case-linked" jurisdiction “depends on an ’affiliatio[n] between the forum and the underlying controversy’ ” (i.e., an “activity or an occurrence that takes place in the forum State and is therefore subject to the State’s regulation”).
Id. at 1121 n.6 (emphasis supplied; citation omitted).
For a State to exercise jurisdiction consistent with due process, the defendant’s suit-related conduct must create a substantial connection with the forum State. Two related aspects of this necessary relationship are relevant in this case.
First, the relationship must arise out of contacts that the “defendant himself’ creates with the forum State . . . We have consistently rejected attempts to satisfy the defendant-focused “minimum contacts” inquiry by demonstrating contacts between the plaintiff (or. third parties) and the forum State.
* * * *
Second, our “minimum contacts” analysis looks to the defendant’s contacts with the forum State itself, not the defendant’s contacts with persons who reside there.
* * * *
|T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant’s conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him ... To be sure, a defendant’s contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant’s relationship with a plaintiff or third parly, standing alone, is an insufficient basis for jurisdiction.
Id. at 1121-23 (emphasis supplied; citations omitted).
Other remarks in the opinion underscore the point that it is the defendant’s “suit-related conduct,” not other, unrelated conduct or contacts, that must make the connection with the forum.
[NJone of petitioner’s challenged conduct had anything to do with Nevada itself.
134 S.Ct. at 1125 (emphasis supplied).
Well-established principles of personal jurisdiction are sufficient to decide this case. The proper focus of the “minimum contacts” inquiry in intentional-tort cases is “the relationship among the defendant, the forum, and the litigation.” And it is the defendant, not the plaintiff or third parties, who must create contacts with the forum State. In this case, the application of those principles is clear: Petitioner’s relevant conduct occurred entirely in Georgia, and the mere fact that his conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction.
Id. at 1126 (citations omitted).
Along the way, the Walden court explained the limitations on the so-called “effects test” of its earlier decision in Calder v. Jones, 465 U.S. 783 (1984). In Calder, the court had held that the California courts had jurisdiction over a Florida newspaper (the National Inquirer) of national circulation, in a libel action brought by a California resident. Observing that the defendants—the newspaper’s editor and a reporter— were “primary participants in an alleged wrongdoing directed at a California resident,” that “the brunt of the harm .. . was suffered in California,” and that the defendants knew this would be so, the court held, “jurisdiction over them is proper on that basis.” Id. at 788-90.[7]
In Walden, however, the court pointed out that in Calder, the defendant newspaper’s contacts with California went well beyond the harm inflicted on the *112 plaintiff: the paper had relied on California sources and focused on the plaintiffs activities in California; it had a circulation there of 600,000; and the plaintiff was injured, and the tort complete, only when those and other readers saw the story about her. 134 S.Ct. at 1123-24. There were, in other words, direct connections among the tortfeasor, the tort, and the forum stemming from the defendant’s conduct, not solely from the residence of the defamed plaintiff.
Returning to the present case: the plaintiffs argument for jurisdiction over Lecorpio relies heavily on the First Circuit’s decision in Astro-Med. Inc. v. Nihon Kohden America, Inc., 591 F.3d 1 (1st Cir. 2009). There, citing the Colder case (among others), the court found jurisdiction over the defendant employer on facts that are indistinguishable in any material respect from those before me: the defendant employer (a California company) knew when it hired the defendant employee (a Florida resident) that his former employer (the plaintiff) was located in the forum state (Rhode Island); it knew that the employment contract contained a noncompete, other restrictive covenants, and forum selection and choice of law clauses specifying Rhode Island courts and law; and it “had sought and obtained legal advice that by hiring [the employee defendant], it was exposing itself to some legal risk.” “(T]his formidable array of Rhode Island connections,” the court held, was enough to confer specific jurisdiction over the defendant employer. Id. at 10.
The connections with the forum state, however— both in Astro-Med and here—were exclusively through the plaintiff, not the corporate defendant, and they were a lot less formidable after Watson than before. Lecorpio’s motion to dismiss under Rule 12(b)(2) is therefore ALLOWED.
C. Forum Non Conveniens
Although labeled “the doctrine of forum non conve-niens,” Bullard’s argument[8] here is that because California law generally refuses, on public policy grounds, to enforce a covenant not to compete (see Section 16600 of the California Business and Professions Code), and because both defendants are California citizens, a Massachusetts court should not enforce it.
The merits and demerits of covenants such as that at issue here are fairly debatable; as the defendants point out, our own Legislature has lately been debating them in connection with various proposals (S846, H1715 and HI729), now amended and consolidated as House Bill 4082. As the public policy of Massachusetts is presently understood, however, “[a] covenant not to compete contained in a contract for personal services will be enforced if it is reasonable, based on all the circumstances.” All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974).
This is not, however, an issue of forum non conve-niens in the strict sense. There is no mention in the defendants’ papers, for example, of such matters as “access to sources of proof, availability of compulsory process for attendance of unwilling witnesses, [and] the cost of obtaining attendance of willing witnesses,” Joly v. Albert Larocque Lumber, Ltd., 397 Mass. 43, 44 (1986), although “the enforceability of a judgment if one is obtained” (id.) is an issue.
This is instead a choice-of-law question, and it is resolved by the fact that Bullard and Anaqua agreed that Massachusetts would supply not only the forum for resolution of disputes relating to the Inventions Agreement, but also the governing law. The forum selection clause is enforceable, see discussion supra, and so is the choice of law clause. “As a rule, ‘[wjhere the parties have expressed a specific intent as to the governing law, Massachusetts courts will uphold the parties’ choice as long as the result is not contrary to public policy.’ ” Hodas v. Morin, 442 Mass. 544, 549-50 (2004) (citations omitted).
The Restatement similarly presumes that the law the parties have chosen applies, unless “(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties’ choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state” and is the State whose law would apply under §188 of the Restatement “in the absence of an effective choice of law by the parties.”
Id. at 550, quoting Restatement (Second) of Conflict of Laws, §187(2).
Massachusetts has a substantial relationship to Anaqua (which is located here), Bullard (who worked for Anaqua), and their contract. Application of Massachusetts law to the noncompetition clause might contravene the public policy of California, but California, where Bullard is now employed, has no greater interest—certainly, not a “materially greater interest”— than does Massachusetts in a dispute over a Massachusetts contract whose breach will affect a Massachusetts resident and employer. See Aspect Software, Inc. v. Barnett, 787 F.Sup.2d 118, 125-27 (D.Mass. 2011).
Although at least one Massachusetts judge has deemed it pointless to enjoin violation of a noncompete by a former employee now working in California, see Aware, Inc. v. Ramirez-Mireles, 2001 WL 755822 (Mass.Super. 2001; van Gestel, J.) [13 Mass. L. Rptr. 257], another has not, see EMC Corp. v. Donatelli, 2009 WL 1663651 (Mass.Super. 2009; Neel, J.) [25 Mass. L. Rptr. 399], and I do not; at least, not ineluctably so.[9] Where an employee of a Massachusetts company has agreed to a post-employment restraint that is enforceable under Massachusetts law that both parties reasonably agree shall apply, but later relocates to a jurisdiction where such restraints are unenforceable, it is “unfair to apply the law of the non-enforcing state and thereby allow the employee to escape the obligations of the contract by, in essence, fleeing the juris *113 diction.” Oxford Global Resources, Inc. v. Guerriero, No. 03-12078-DPW, 2003 U.S. Dist., 2003 WL 23112398, at *6 (D.Mass., Dec. 30, 2003). Whether or not fee requested decree can be enforced against Bullock, how, and where, is for another day and, perhaps, another forum.
D. Failure to State a Claim
Count I of fee Complaint asserts a claim against Bullard for breach of fee covenant not to compete; Count II, for misappropriation of trade secrets. Two of fee grounds for Bullard’s motion to dismiss—feat fee noncompetition clause is invalid because its geographic reach is overbroad, and because of the change in Bullard’s job responsibilities and compensation— have already been discussed.
The third—feat fee Complaint does not allege a business interest feat is legitimately protectable by a covenant not to compete—proceeds from the premise feat “[a] plaintiff has no cognizable trade secret claim until it has adequately identified the specific trade secrets feat are at issue,” Cambridge Internet Solutions, Inc. v. Avicon Group, 1999 WL 959673 (Mass.Super. 1999; Quinlan, J.) [10 Mass. L. Rptr. 529], and Bullard’s assertion feat the complaint in this case fails to do so. Under well-settled Massachusetts law,
[a] covenant not to compete contained in a contract for personal services will be enforced if it is reasonable, based on all fee circumstances. In determining whether a covenant will be enforced, in whole or in part, fee reasonable needs of fee former employer for protection against harmful conduct of fee former employee must be weighed against both the reasonableness of fee restraint imposed on fee former employee and the public interest. If the covenant is too broad in time, in space or in any other respect, it will be enforced only to the extent feat is reasonable and to the extent feat it is severable for the purposes of enforcement.
All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974) (citations omitted).
Employee covenants not to compete generally are enforceable only to fee extent that they are necessary to protect fee legitimate business interests of fee employer. Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, fee goodwill the employer has acquired through dealings wife his customers. Protection of fee employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for feat purpose will not be enforced.
Marine Contractors, Inc. v. Hurley, 365 Mass. 280, 287-88 (1974) (citations omitted).
The Complaint does not suggest that Bullard—who was out of fee direct sales business during his last two years at Anaqua—is in a position to capitalize on customer goodwill to the detriment of Anaqua. It does, however, allege feat
while employed at Anaqua, Mr. Bullard served on Anaqua’s executive team. In this role, Mr. Bullard obtained Anaqua’s confidential and proprietary information and trade secrets regarding matters ranging from roadmaps for future products to lists of prospective clients. (Complaint, ¶2.)
* * * *
Mr. Bullard came into possession of Anaqua’s proprietary and confidential information and trade secrets. This information included, but is not limited to, client lists, prospective client lists, knowledge of Anaqua’s pricing methods, Anaqua’s pricing to current customers, knowledge of Anaqua’s negotiations wife and offers to prospective clients, product development roadmaps, and corporate strategy plans. (Complaint, ¶19.)
The Complaint also quotes a press release by Lecorpio, announcing its hire of Bullard “as vice president of product management,” in which position he “will help drive Lecorpio’s customer driven product strategy.” The press release observes feat “(p]rior to joining Lecorpio, Mark was vice president of sales for Lecorpio competitor Anaqua.”
It is certainly true feat fee Complaint does not go into much detail in describing the confidential information at stake. Specificity is a matter of degree, however, and fee more specificiiy employed in a public filing, fee less confidentiality survives. In the circumstances, the allegation that Bullard had high-level access to Anaqua’s future product and sales strategy, coupled with fee fact feat he apparently now has a high-level position with Lecorpio in its product development function, is enough to survive a motion to dismiss. The motion to dismiss is therefore denied as to Counts I and n, against Bullard.
MOTION FOR PRELIMINARY INJUNCTION A. Standard for Issuance of a Preliminary Injunction
The nature of fee proceedings on a motion for preliminary injunction, and fee standard for its issuance, are familiar:
By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of fee facts and the law. On the basis of this record, fee moving party must show feat, without fee requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits. Should the injunction issue, however, the enjoined party may suffer precisely the same type of irreparable harm. Since the judge’s assessment of fee parties’ lawful rights at fee preliminary stage of fee proceedings may not correspond to fee final judgment, fee judge should seek to minimize fee “harm that final relief cannot re *114 dress,” by creating or preserving, in so far as possible, a state of affairs such that after the full trial, a meaningful decision may be rendered for either party.
Therefore, when asked to grant a preliminary injunction, the judge initially evaluates in combination the moving party’s claim of injury and chance of success on the merits. If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party. What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.
Packaging Indus. Group. Inc. v. Cheney, 380 Mass. 609, 616-17 (1980) (citations and footnotes omitted).
B. Likelihood of Success
As discussed already, Anaqua is likely to prevail on its arguments that the Inventions Agreement survives Bullard’s promotion and accompanying changes in his title, duties, and compensation structure, because the parties explicitly agreed that it would. Also, the agreement’s forum selection clause and choice-of-law clause are enforceable; therefore, there is jurisdiction in this Court over Mr. Bullard, and Massachusetts law applies. Although California law may or may not impede the enforcement of any order this Court might issue to enforce the covenant not to compete, it ought not impede the issuance of such an order if otherwise proper under Massachusetts law. And the Complaint, which articulates a legitimate business reason behind the noncompete clause, states a claim.
Surviving a motion to dismiss, however, does not necessarily mean entitlement to a preliminaiy injunction. The two sides have submitted affidavits and deposition testimony addressing the central issues of whether and to what extent Bullard had access to confidential information at Anaqua that he might use at Lecorpio to Anaqua’s detriment. The two sides agree on some important facts and disagree on some details.
It is undisputed that Anaqua and Lecorpio offer similar products and services (software to enable the customer to manage its intellectual property), aimed at the same need and the same customers, for whom the two companies (and others in the same field) sometimes compete head-to-head. There likewise appears to be agreement that Bullard did not leave Anaqua with formulas, recipes, source code, industrial processes, or similar technical data.
The concern Anaqua expresses is rather over strategic business information to which Bullard was exposed in teleconferences of its nine-member Executive Team, which it characterizes as follows:
Anaqua’s financial status, including, concerns and plans for Anaqua’s long-term financial strategy, Anaqua’s cash flow, Anaqua’s multi-year financial projections, revenue composition, and gross margins on business items.
Anaqua’s product development plans and 36-month roadmaps for added functionality, improvements and enhancements to its software and other products.
Sales processes including progress with potential clients.
Anaqua’s methods of calculating and promoting its Return on Investment value proposition for clients.
Anaqua’s marketing efforts, including its strategic analysis of the market and Anaqua’s competitors, marketing plans and strategy, strategic leads and methods for developing leads.
(Affidavit of Jack Morgan in Support of Preliminary Injunction, ¶13.)
Not all of these concerns deserve equal weight. Bullard now works as Lecorpio’s Vice President for Product Management, and is unlikely to have much use for information concerning Anaqua’s financial condition. Its pricing, sales pitches, and the present functionality of its products are known to its customers, who may be pleased to share it with Lecorpio and others in the field in the interest of getting the best solution at the best price. There is evidence that at any given moment, Anaqua has an idea of which among its own clients and prospects Lecorpio has in its sights, and reason to suppose that Lecorpio has similar information about what Anaqua is up to from its own discussions with customers and prospects.
It is difficult, however, to ignore the connection between Anaqua’s plans for future product development and Bullard’s work, formerly for Anaqua but now more directly for Lecorpio. As Bullard described his current position as Lecorpio’s VP of Product Management;
So my primary responsibilities—well, let’s see. Two primary responsibilities would be evaluating our product in the market place, to look for opportunities to expand our offering through either adding new functionalities requiring other companies or partnering with other companies. So that’s one big piece. The second big piece would be working with our customers to identify how it can improve the product to meet their needs.
¡¡t * s#s *
I think that’s it. I think one last thing I guess would be—well, the nature of a small business is that you *115 have thought on whatever, so that’s kind of the nature of a small business. But as far as my responsibilities go, I think the third one would potentially be product marketing, which is basically the—defining how we describe the capabilities. So if I’m hearing from customers they want to do bla, bla and bla, and let’s say three or four of our customers requested that and then we build it, then I need to be able to explain to our customers and also to our company so that we can sell that capability. What it is. What it is that we’ve done. So that’s product marketing.
(Deposition of Mark Bullard, pp. 41, 46-47.) Asked whether one of his responsibilities was to help Lecorpio differentiate itself from Anaqua, Bullard replied, “Yes. Not the primary responsibilities, but that is a piece of what I’m responsible for as well as differentiating ourselves from all of the market.” (Id. at 50.)
Comprehensive knowledge of the product, current and planned, is inseparable from good salesmanship. Unlike many commodities, software is updated regularly (here, with several releases per year), partly to fix bugs but also to make functional improvements. In a close race among a small field, some changes will inevitably be responsive to—or in anticipation of—developments in the competitors’ products. Both of these companies look to their customers for suggested improvements, but it is hard to doubt the value of knowledge of a direct competitor’s plans and the competitive advantage it might bring, at least for a time.
Bullard has averred that he takes care not to divulge Anaqua’s confidential information now that he works for Lecorpio, and there are copies of emails suggesting that both Bullard and Lecorpio are making a sincere effort to avoid forbidden territory. There is no solid reason to doubt their good faith in this regard.
The emails underscore the fact, however, that Bullard does possess confidential information concerning Anaqua’s business, including its plans for future product development. Knowing such plans for the next three years—or even one-[10]—would be a significant advantage for a Lecorpio employee tasked with keeping its own products even with, or ahead of, the competition. It would be difficult, if not impossible, for him put such information out of his mind, particularly if he is motivated to turn in his best possible performance.
That Anaqua cannot point to direct evidence of misuse of its confidential information is not a bar to enforcing the noncompetition covenant. Such covenants, of course, are “scrutinized carefully,” because “an ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer.” Alexander v. Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 496 (1986). That they are permitted at all is due, in part, to the difficulty of detecting, then proving, a former employee’s misuse of confidential information. The covenant, if tailored to the employer’s legitimate interests, serves as a prophylactic protection for the plaintiffs secrets in the hands of its former employee. See Affinity Partners, Inc. v. Drees, 1996 WL 1352635 at *5 (Mass.Super. 1996; Cowin, J.) [5 Mass. L. Rptr. 163] (“If material is disclosed to a competitor for whom Drees may work, Affinity would have no means of ascertaining (or proving) that fact”); cf. Boulanger v. Dunkin’ Donuts, Inc., 442 Mass. 635, 643 n. 12 (2004) (covenant in franchise agreement; “working for a competitor of the [franchise] makes it likely that the information the [franchisee] possesses will be used, yet it might be impossible to detect or prove”).
Anaqua has established that it is likely to succeed on its claim that Bullock, by accepting employment with Lecorpio, has breached an enforceable covenant not to compete.
C. Balance of Harms
Finally, there is the balance of harms. Although the risk of harm to Anaqua is real, it is difficult to quantify. Bullard has already been with Lecorpio for three months. Whether he has yet used his knowledge of Anaqua’s plans for product development, or whether he will in the future, is unknown. What is known is that he possesses such information; it may be used to the advantage of a competitor and the detriment of Anaqua; and for this reason, he and Anaqua agreed that he would not work for a competitor until a year had passed.
The potential harm to Bullard is more readily quantifiable. He left Anaqua on September 20, 2013 and began work for Lecorpio on April 23, 2014, with just under five months to go on his one-year covenant not to compete. Anaqua requests that Bullard be enjoined from competing with it for the five months that it is “owed,” which is reasonable. While I do not discount the cost to Bullard and his family of putting him out of work in this field for five months, I note that he was promoting his book and consulting part-time to a wineiy—not engaged in an active job search—when Lecorpio recruited him earlier this year.
Finally, although it is not cash in hand, any potential harm from a wrongly-ordered injunction can be bonded under Mass.R.Civ.P. 65(c), which I will order.[11] Considered in conjunction with the parties’ respective likelihood of success, the balance of harms tilts in favor of issuing the requested injunction.
ORDER
For the foregoing reasons,
1. Defendants’ Motion to Dismiss is ALLOWED for lack of personal jurisdiction as to defendant Lecorpio, but DENIED as to defendant Bullard; and
*116 2. Plaintiffs Motion for Preliminary Injunction is ALLOWED as follows. Defendant Bullard is preliminarily enjoined, until further order of the Court, from:
a. Employment with defendant Lecorpio, LLC for a period of 150 days after the date of entry of this injunction, this aspect of the injunction being conditioned on the plaintiff posting security under Mass.R.Civ.P. 65(c) in the form of a bond, or payment into court, in the sum of $150,000; and
b. Disclosing or providing to Lecorpio or others any confidential information and/or trade secrets belonging to Anaqua.

 See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004); Harhen v. Brown, 431 Mass. 838, 840 (2000); Schaer v. Brandeis University, 432 Mass. 474, 477 (2000).

 Evidence submitted outside the Complaint discloses that in fact, Bullard had been working on a novel before and during the period that he was working for Anaqua, and that he finished it after he left, then devoted time to promoting the book and consulting part-time to a winery. The book, titled Pillows for your Prison Cell, is published by Brainsquall Books. Lecorpio contacted him via Linkedln, and he began work there on April 23, 2014.

 Both Jacobson and Ajemian addressed whether the Massachusetts court in which the case was filed should enforce a contractual agreement to litigate elsewhere. This case is the mirror image of those, but I can’t think of a reason why the considerations articulated in those cases should not apply here as well.

 See, e.g., Leibowitz v. Aternity, Inc., 2010 WL 2803979 (U.S.Dist.Ct. E.D.N.Y., July 14, 2010) at *22 (no abrogation where non-compete agreement expressly stated, “Any subsequent change or changes in [employee’s] duties, salary or compensation will not affect the validity or scope of this Agreement”; applying Massachusetts law); A.R.S. Services, Inc. v. Morse, 2013 WL 2152181 (Mass.Super. 2013) (Leibensperger, J.) [31 Mass. L. Rptr. 227] (similar); cf. Carl Getman & Cleary Schultz Ins., LLC v. USI Holdings Corp., 2005 WL 2183159 (Mass.Super. 2005; Gants, J.) [19 Mass. L. Rptr. 679] (change in salary and commission did not abrogate agreement which had not specified the rate for either). This is not a case in which, for example, the employer at the time of the change tendered a new noncompetition agreement and the employee expressed his contrary intent by refusing to sign, as in AFC Cable Sys. v. Clisham, 62 F.Sup.2d 167, 173 (D.Mass. 1999), and Grace Hunt IT Solutions, LLC v. SIS Software, LLC, 29 Mass. L. Rptr. 460, 2012 WL 1088825 (Mass.Super. 2012; Lauriat, J.), or where the employer materially breached the employment agreement, as in Protege Software Services, Inc. v. Colameta, 2012 WL 3030268 (Mass.Super. 2012; Kirpalani, J.) [32 Mass. L. Rptr. 127], and Lantor, Inc. v. Ellis, 1998 WL 726502 (Mass.Super.; Gants, J.) [9 Mass. L. Rptr. 221].

 There is general jurisdiction when the defendant’s “affiliations with the State are so ‘continuous and systematic as to render [it] essentially at home in the forum State.’ ” Daimler AG v. Bauman, 134 S.Ct. 746, 754 (2014), quoting Goodyear Dunlop Tires Operations. S.A. v. Brown, 564 U.S_, 131 S.Ct. 2846, 2851 (2011), and referencing, as “the textbook case of general jurisdiction,” Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952). There, the court held there was jurisdiction in Ohio over a claim against a Philippines corporation for issuance of stock certificates and dividends, because management had pulled up stakes during the Japanese occupation and moved to Ohio, where the president kept an office, maintained the corporate files, and “carried on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company.” 342 U.S. at 448. Where, as in Perkins, the defendant is an actual or defacto resident of the forum, the courts of the forum “may hear any and all claims against [it],” whether or not they arose in, or are otherwise related to, the forum. Daimler at 754.
Section 3(d) of Chapter 223A has sometimes been said to be “predicated on general jurisdiction.” Fern v. Immergut, 55 Mass.App.Ct. 577, 581 n.9 (2002), quoting Connecticut Natl. Bank v. Hoover Treated Wood Prods., Inc., 37 Mass.App.Ct. 231, 233-34 n.6 (1994). If so, the low threshold that the cases have set for the statutory “substantial revenue” requirement (see text supra) seems misplaced, because it falls far short of the constitutional requirements for general jurisdiction. In this case, for example, while it has a paying customer and some prospects here, there is no viable contention that Lecorpio is “essentially at home” in Massachusetts.

 International Shoe Co. v. Washington, 326 U.S. 310 (1945), “]t]he canonical opinion in this area.” Daimler at 754.

 As one commentator has noted, “]c]ourts across the United States have struggled with the import of Calder by failing to define a consistent limit for application of the effects test . . .” T.R. Fulford, Case Comment: Civil Procedure— Forum Injury May Constitute Forum Contact for Relatedness Prong of Specific Jurisdiction Injury—Astro-Med. Inc. v Nihon Kohden America, Inc., 591 F.3d 1 (1st Cir. 2009), Suffolk University Law Review Vol. XLIV:775 at 780 (2011).

 For the most part, the defendants join in each of the arguments for dismissal. Given Lecorpio’s success on the personal jurisdiction issue, the discussion from here on out will focus on Bullard.

 It is an open question whether a foreign court’s decree enforcing a noncompete will be honored in California, whose public policy against such covenants may or may not be subject to a “trade secret exception.” Edwards v. Arthur Andersen LLP, 44 Cal.4th 937, 945-46 & n.4, 189 P.3d 285 (2008); Dowell v. Biosense Webster, Inc., 179 Cal.App.4th 564, 577-78, 102 Cal.Rptr.3d 1 (Cal.App.2d Dist. 2009); see Nedlloyd Lines B.V. v. Superior Court, 3 Cal.4th 459, 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992) (California courts will enforce a choice of law clause if the chosen state has a substantial relationship to the parties or their transaction, or if there is any other reasonable basis for the parties’ choice of law, and “provided the chosen state’s law is not contrary to a fundamental policy of California”). Bullock, however, also has connections in the State of Washington, whose “]c]ourts enforce noncompete agreements that are validly formed and are reasonable,” much as Massachusetts courts do. Labriola v. Pollard Group, Inc., 152 Wash.2d 828, 833, 100 P.3d 791 (2004).

 Bullard, in his affidavit, denies that he was privy to “any product road maps longer than 12 months.” The difference is not as material as it may seem on its face, since plans and projections tend to be less reliable the farther out they go. Plans for the next year are bound to have greater predictive power than those for years two and three, as the parties seem to have acknowledged implicitly with the one-year duration of the covenant not to compete.

 Although the record reflects that Bullard’s compensation with Lecorpio includes salary, bonus, and option components, it does not supply figures. The bond amount is therefore a not-veiy-informed best estimate of what Bullard may lose by being out of work for 150 days.